*Decisions will be entered under Rule 50.*

HAROLD K. HOCHSCHILD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1084. Promulgated June 11, 1946.

*John F. Dooling, Esq.*, for the petitioner.
*Scott Dahlquist, Esq.*, for the respondent.

#### OPINION.

OPPER, *Judge*: This proceeding was brought for a redetermination of a deficiency of $4,238.71 in the petitioner's income tax for the year 1939.

Certain items are conceded by petitioner. The litigated issue is whether a fee paid attorneys is deductible under section 23 (a) of the Internal Revenue Code. An alternative contention by petitioner is that the amount involved is deductible as a loss under section 23 (e).

The facts appear from a stipulation of the parties. They are hereby found accordingly.

Petitioner is a resident of New York City, and he filed his return for the tax period in question with the collector of internal revenue for the second district of New York.

The American Metal Co., Ltd. (hereinafter called the Metal Co.), is a New York corporation, organized in 1887. Petitioner has held various offices in the Metal Co. continuously since 1916, and from November 27, 1934, to the present has been a director and president. During the years 1918 through 1939 petitioner at all times owned not less than 4.5216 per cent of the common stock of the Metal Co.

The highest and lowest selling prices of the common stock of the Metal Co. on the New York Stock Exchange during the year 1938 were 45 and 23, respectively, and the highest selling price of such stock on December 30, 1938, was 37⅞.

Climax Molybdenum Co. (hereinafter called Climax) was organized in Delaware on January 17, 1918. Petitioner at various times has held offices in Climax of director, treasurer, and secretary. From 1918 through 1929, petitioner's holdings of Climax's stock represented from 3 per cent to 5.826 per cent of its stock. Thereafter and through the end of 1939 petitioner owned not less than 5.6 per cent of such capital stock, and during the year 1939 held 141,122 shares of such stock out of 2,520,000 shares then outstanding.

The highest and lowest selling prices of the capital stock of Climax on the New York Stock Exchange during the year 1938 were 60¼ and 32½ respectively, and the highest selling price on December 30, 1938, was 59⅞.

There was a practice of long standing in the Metal Co., at least until 1918, whereby officers, directors, stockholders, and employees were permitted to take participations in new business ventures of the Metal Co.; there had been more than forty such ventures prior to 1916. Under the policy referred to there were no fixed proportions as between the Metal Co. and the other joint participants in new ventures, such participations being determined in the discretion of the management. This was with the consent of the then stockholders of the Metal Co.

In November 1916 the management of the Metal Co. formed a syndicate, consisting of the Metal Co. and a number of its officers, employees, and stockholders (including petitioner), to acquire an option on certain molybdenum properties at Climax, Colorado, from a group represented by Heckendorf. The arrangement was that the Heckendorf group would receive a 25 per cent interest in any company formed to exploit the molybdenum properties and the Metal Co. syndicate would receive a 75 per cent interest. The interests of the syndicate participants in the 75 per cent share in the option were as follows:

|  | Per cent |
|---|---|
| Metal Co. | 70 |
| Petitioner | 1 |
| Other officers, employees, and stockholders of Metal Co. | 29 |

In late 1917 the option on the molybdenum properties was exercised and upon the exercise of the option definitive participations in 75 per cent of the venture available to the Metal Co. and its associates were fixed at 10 per cent to the Metal Co., 4 per cent to petitioner, and 86 per cent to other officers, stockholders, and employees of the Metal Co. Each participant thereupon became liable for and paid the latter that percentage of all the expenses incurred since the original acquisition of the option. Petitioner thus became liable for and paid at December 31, 1917, 4 per cent of all expenses incurred to that date in the molybdenum venture.

Petitioner accordingly acquired on April 1, 1918, 1,500 shares of Climax or 4 per cent of the 37,500 shares of stock of Climax issued to the Metal Co. and its associates.

Climax issued additional stock in 1920–1921 and petitioner then acquired 1,500 additional shares, 321 of which were surrendered by him in 1926 in compromise of a litigation between Climax and the Metal Co. The stock of Climax was split 10 shares for 1 in 1929, and 3 shares for 1 in 1935. Petitioner derived taxable dividend income from his holdings of Climax stock after 1933 as follows:

| | |
|---|---:|
| 1933 | $10,097.68 |
| 1934 | 10,085.86 |
| 1935 | 103,540.21 |
| 1936 | 144,487.00 |
| 1937 | 245,752.40 |
| 1958 | 316,688.40 |
| 1939 | 450,680.40 |
| Total | 1,281,331.95 |

At all times since 1916 petitioner has been a full-time salaried employee or officer of the Metal Co. (except for periods during World War I and World War II, when he was in the War Department or the armed forces of the United States.

At the time of the institution of the litigation hereinafter described, Metal Co. owned and now owns a larger number of shares of Climax than any other two stockholders.

On December 31, 1938, a stockholders' derivative action was commenced in the Supreme Court of the State of New York, County of New York, by Alfred Turner, a stockholder of the Metal Co., against the Metal Co., the petitioner, and others for relief on the ground of alleged breaches by petitioner and others of their fiduciary duties to the Metal Co. in respect of the Climax venture. In part, the complaint charged that the directors, officers, and employees of the Metal Co. (including petitioner), believing the Climax venture to be of great value, after acquiring it for the Metal Co. in December 1916, caused the Metal Co. to relinquish to them in various proportions 30 per cent of the 75 per cent of the Climax venture acquired for the Metal Co.; that late in 1917, believing the Climax venture was of greater value than originally supposed, they further reduced the interest of the Metal Co. and acquired for themselves in various proportions 90 per cent of the 75 per cent of the venture available to the Metal Co., leaving the Metal Co. with only 10 per cent of the 75 per cent. The complaint further charged that the stock of Climax was issued in pursuance of this later allocation of interests to the petitioner and other officers, directors, and shareholders of the Metal Co. The complaint further charged that, after the organization of Climax,

the Metal Co. was caused by the defendants to spend money on behalf of Climax and to extend to it the use of the Metal Co.'s facilities, services, and personnel, all of which were necessary to the development of Climax, and none of which were paid for by Climax. The complaint claimed that the Climax stock acquired by the petitioner and the other officers, directors, and employees was impressed with a trust in favor of the Metal Co., and that Climax and the same defendants, including petitioner, were also indebted to the Metal Co. for the value of the money spent and facilities, services, and personnel made available to Climax by the Metal Co. And it was alleged that the defendants conspired to these ends. The relief prayed for by the complaint was that the Climax stock held by the defendants, including petitioner, be impressed with a trust in favor of the Metal Co.; that petitioner and the other individual defendants be ordered to assign and transfer their Climax stock to the Metal Co.; that the petitioner and the other individual defendants be ordered to account to the Metal Co. for all money and benefits received by them by way of profit or dividend on their Climax stock; and that Climax and the individual defendants, including petitioner, account to the Metal Co. for all sums due to it from Climax.

The answer of petitioner and the other defendants traversed every material allegation of the complaint and pleaded affirmatively the good faith of the defendants, the knowledge and acquiescence of the stockholders of the Metal Co. in the disposition made of Climax, the risky and speculative nature of the Climax venture, the defendants' offer in 1920 to transfer their individual interests in Climax to the Metal Co. at cost and the refusal of the Metal Co. to accept this offer, and many other facts respecting the estoppel of the Metal Co. and its stockholders to assert any claim against the defendants. They also pleaded the statute of limitations.

The case came on for trial on May 19, 1941, and, after a trial which occupied twenty-four trial days, an opinion, decision, and interlocutory judgment were rendered. The interlocutory judgment was in part adverse to petitioner.

The trial court considered that Climax had been a corporate opportunity of the Metal Co. which should not have been allocated to the individual defendants to the extent that it was allocated to them in 1917; that the defendants' offer to transfer their Climax interests to the Metal Co. and the Metal Co.'s rejection of that offer in 1920 were not established; and that Climax and the defendants were liable to the Metal Co. for services, resources, and facilities made available to Climax by the Metal Co. without adequate compensation. The court found, however, that the statute of limitations barred the recovery of the stock from petitioner and all the defendants, except one. As to him, the court ordered him to account and held that his Climax shares

were impressed with a trust in favor of American Metal "and declared to be its property." He was also required to account "for the present value of those shares of stock of Climax * * * which he may have sold or otherwise disposed of * * *." The individual defendants were held liable only secondarily upon the accounting ordered against Climax with respect to services, resources, and facilities made available to it by the Metal Co.

The plaintiffs in the case and petitioner prosecuted cross-appeals from the interlocutory judgment to the Appellate Division of the Supreme Court of the State of New York, First Department, and on such appeals the decision and interlocutory judgment were reversed so far as adverse to petitioner and affirmed so far as favorable to him. The judgment of reversal and affirmance directed the dismissal of the complaint as against petitioner on the merits.

The Appellate Division found that the defendants had acted in good faith throughout; that the original allocations of participations in the Climax option and in the Climax venture itself were dictated by considerations of sound business judgment, in accordance with the custom of the company, respecting the participation in new ventures of its directors, officers, and employees; that the speculative Climax venture was not a corporate opportunity of the Metal Co., in part because of its extremely speculative nature, as well as because it lay outside the established scope of the Metal Co.'s business; that the defendants in good faith had in 1920 offered to transfer their Climax interests to the Metal Co. at cost, but that the Metal Co., acting through disinterested directors representing very substantial stock interests, rejected the offer in the exercise of a sound and informed judgment; that the reciprocal interchange of information, services, advice, and facilities between Climax and the Metal Co. involved no impropriety; that the very large interest of the Metal Co. in Climax warranted the expenditure of considerable time on affairs of Climax by the Metal Co.'s personnel; that the relation between the two companies was characterized by adherence to high standards of fiduciary conduct; and that there was no ground for ordering an accounting by Climax to the Metal Co. with respect to services, resources, and facilities. The Appellate Division accordingly made new findings and directed that the complaint be dismissed on the merits. The Appellate Division acted unanimously.

The estate of petitioner's father, Berthold Hochschild, named as a defendant in the cases, had been fully distributed when the cases were instituted; petitioner received in 1928 in the distribution of the estate of Berthold Hochschild 2,232⅔ shares of Climax stock. Berthold Hochschild died January 24, 1928. Until his death he had been a director of the Metal Co.; he was its president from 1911 until Feb-

ruary 13, 1918; and he was chairman of its board from February 14, 1918, until March 10, 1924.

The expenditure in the amount of $4,125, deduction of which has been disallowed by respondent, was paid and incurred in 1939 in the defense of the above described litigation.

Although somewhat confused in its presentation, the single issue of the deductibility of petitioner's attorneys' fees paid in defense of litigation in which he was one of the defendants, narrows to two basic controversies. The first is whether they are trade or business expenses in view of the circumstances pursuant to which petitioner first obtained the property which was at stake in the litigation. The second is whether in any event the 1942 amendment [1] permits their deduction as a consequence of the management or conservation of property held for the production of income.

In interpreting the facts, we regard as a necessary conclusion that the purpose and effect of the attack embodied in the suit in which petitioner was a defendant was to wrest from him and certain of his codefendants the equitable, if not the legal, title to property which the plaintiffs insisted had been procured in violation of their rights as minority stockholders. It is true that petitioner was at the time an officer and director of the corporation involved, and that, as such, he was being compensated. We have no serious doubt that to that extent he was engaged in a trade or business. But petitioner was also a stockholder of the corporation, and the subject matter of the litigation—the property received by him in the form of stock in a related but distinct enterprise—is not shown to have been the product of his activities as officer or director.

It is stipulated by the present parties that "There was a practice of long standing in The Metal Company [the corporation]  *  *  * whereby officers, directors, *stockholders* and employees were permitted to take participations in new business ventures  *  *  *." (Emphasis added.) And several of petitioner's codefendants appear to have been neither officers nor directors, but were participating owners of the property in dispute. It seems to us that the object and necessary effect of the litigation was to deny and seek to overthrow the dominion and equitable title of the respective defendants, and that it was against petitioner as an owner of the property, along with others who were likewise owners, that the action was directed. We conclude, as a

---

[1] SEC. 121.  *  *  *

(a) DEDUCTION FOR EXPENSES.—Section 23 (a) (relating to deduction for expenses) is amended to read as follows:

"(a) Expenses.—

"(1)  *  *  *

"(2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

matter of fact and law, that the consequent defense of the litigation was paid for by petitioner to protect the title to his property and was not an expense of petitioner's trade or business.

Under such circumstances it has been held that the leave now given to deduct nontrade expenses does not apply where, as here, the outlay was for the defense of litigation attacking the taxpayer's title to property, but, on the contrary, that the expenditure is capital in its nature and becomes a part of the basis. *Bowers* v. *Lumpkin* (C. C. A., 4th Cir.), 140 Fed. (2d) 927; certiorari denied, 322 U. S. 755; *James C. Coughlin*, 3 T. C. 420. And we can not agree that the effect of the *Bingham* case [2] was to discredit or overrule these authorities. There the Supreme Court permitted the deduction of expenses incurred in tax litigation which the Tax Court had in the first instance found no difficulty in approving (2 T. C. 853). No criticism was leveled at the already long established doctrine that expenditures in defense of title are capital and not an offset against current income. We view the contrary conclusion as required. The opinion in the *Bingham* case declares that:

* * * The effect of § 23 (a) (2) was to provide for a class of non-business deductions coextensive with the business deductions allowed by § 23 (a) (1), except for the fact that, since they were not incurred in connection with a business, the section made it necessary that they be incurred for the production of income or in the management or conservation of property held for the production of income. * * *

The test accordingly seems to us to be whether prior to the amendment such a deduction as that now in controversy would have been permitted to a taxpayer admittedly engaged in carrying on a trade or business. The application of that test shows that the defense-of-title rule had been repeatedly applied in the trade or business situation, and that such taxpayers were equally required to capitalize the outlay. Thus, in *Levitt & Sons, Inc.* v. *Nunan* (C. C. A., 2d Cir.), 142 Fed. (2d) 795, the taxpayer, a corporation engaged in the real estate business, sought to deduct the expenses of settlement of a threatened lawsuit under the 1938 Act, "on the theory that it was 'an ordinary and necessary expense' of 'carrying on' its 'business' * * *." The opinion quotes the Treasury regulation to the effect that "the cost of defending or perfecting a title to property constitutes a part of the cost of the property and is not a deductible expense." It comments that "There can be no question of its validity, and the courts have applied it in a number of instances to situations in which a taxpayer has either settled a claim to property in his possession, or paid the expenses of defending it." The conclusion from the *Bingham* case hence seems inevitable that it was not the purpose of section 23 (a) (2) to abro-

---

[2] *Bingham* v. *Commissioner*, 325 U. S. 365.

gate that distinction as applied to nonbusiness expenses. We conclude that, in so far as the payments in question can be regarded as expended to enable petitioner to resist the effort to deprive him of specific property, they are capital in nature and, therefore, nondeductible, either as business expenses [3] or as a loss. *Levitt & Sons, Inc.* v. *Nunan, supra.*

It does not follow, however, that the property aspect colors the entire litigation. A part of the effort of the action brought against petitioner was to secure an accounting for the dividends received by him and to require their transfer. In this respect the expenditures are at least comparable to those required for the collection of income. They are logical offsets against income, whether paid to secure it in the first place or to retain it after it has been collected. *Kornhauser* v. *United States*, 276 U. S. 145, is distinguished in *Levitt & Sons, Inc.* v. *Nunan, supra,* on this specific ground, "for the payment was to defend the taxpayer's title to property which was itself income : i. e., shares of stock received in payment for services." In the *Bartholomew* proceeding (footnote 3, *supra*) the subject matter of the litigation in which the sums were expended was Bartholomew's "earnings" and "estate." But the opinion takes note that:

\* \* \* The original transaction here was a contract for the continuing services of Freddie as a motion picture actor over a period of years. His earnings and estate were derived from this contract \* \* \*. It seems reasonable to hold that any litigation which sought to increase the production of income, or to protect the right to income produced, being produced, or to be produced, or to prevent others from acquiring a right, title, or interest therein, would be proximately related to "the production or collection of income" \* \* \*.

See also *James Lewis Caldwell McFaddin*, 2 T. C. 395, 411; remanded, other grounds (C. C. A., 5th Cir.), 148 Fed. (2d) 570.

Nor is this a case where the factors are so commingled as to defy allocation. See *Helvering* v. *Stormfeltz* (C. C. A., 8th Cir.), 142 Fed. (2d) 982; and cf. *James C. Coughlin, supra.* The record discloses the fair market value of the stock sought by the plaintiffs in the stockholders' action to be 59⅞ per share on December 30, 1938, the day before the filing of the suit, and that petitioner held 141,122 shares. The interim dividend income which petitioner received from the stock appears from the record to be $1,281,331.95. A mathematical application of these figures will give the proportion (approximately 15 per cent) of the attorneys' fees which are attributable to income and, therefore, deductible. The exact computation of the deductible amount may be left for the recomputation, which in any event becomes necessary by reason of certain conceded items.

*Decision will be entered under Rule 50.*

---

[3] In *Estate of Frederick Cecil Bartholomew*, 4 T. C. 349, the Tax Court was of the opinion that the litigation expenditures did not involve a defense of title, and on that ground it distinguished *Bowers* v. *Lumpkin, supra.* See also *Samuel D. Leidesdorf*, 26 B. T. A. 881.