HERMANN F. RUOFF AND MADELEINE DUPONT RUOFF, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59951. Filed May 12, 1958.

*Karl Riemer, Esq.*, for the petitioners.
*Stanley W. Herzfeld, Esq.*, for the respondent.

Respondent determined a deficiency of $42,443.24 in petitioners' income tax for 1953. The only remaining issue is whether expenses of

litigation in connection with a suit to recover property "vested" by the Attorney General, under authority of the Trading With the Enemy Act, are deductible in 1953 when paid.

All the facts are stipulated and they are hereby so found. Madeleine duPont Ruoff, hereafter refererd to as petitioner, and Hermann F. Ruoff, her husband, are citizens of the United States, residing at Mahwah, New Jersey. They filed their joint Federal income tax return for 1953 with the collector of internal revenue for the district of Delaware. They kept their books and made their 1953 tax return on the cash basis.

On September 23, 1948, the Attorney General of the United States issued a vesting order under the Trading With the Enemy Act, relating to petitioner's property. By that order he (a) found petitioner to be a citizen of an enemy country, Germany, (b) determined that the national interest of the United States required that she be treated as a German national, and (c) vested in himself all of petitioner's property in the United States, as identified on a schedule annexed to the order. He amended the vesting order *nunc pro tunc* on October 1, 1948. The Attorney General maintained powers of supervision and control with respect to all of petitioner's property in the United States, but an order dated December 8, 1948, terminated supervision and control of certain property not here in controversy.

On September 23, 1948, petitioner owned various corporate stocks and corporate and municipal bonds of an aggregate value of approximately $2,000,000. Before, at, and after September 23, 1948, those stocks and bonds produced annual dividends and interest income aggregating about $75,000. The property vested in the Attorney General included these stocks and bonds.

On September 23, 1948, petitioner was the life beneficiary of the income of a trust established by herself in 1927 for her own benefit and that of her sons as remaindermen. The value of the corpus of the trust approximated $250,000 with an annual income of approximately $10,000. The property vested in the Attorney General included petitioner's interest in this trust. It also included an interest in a mortgage requiring periodic principal and interest payments amounting to about $240 per year.

On October 7, 1948, petitioner retained attorneys to pursue whatever administrative and judicial remedies were available to secure the return of the vested property. On November 10, 1948, the attorneys filed with the Attorney General petitioner's notice of claim under the Trading With the Enemy Act for the return to her of the vested property. On November 15, 1948, they filed a civil action under the Trading With the Enemy Act in the United States District Court for the

District of Columbia on petitioner's behalf against the Attorney General for the return to her of the vested property, alleging that petitioner was at all material times the lawful owner of the vested property. The defendant, the Attorney General, denied the allegation.

On August 12, 1953, petitioner's attorneys and the Attorney General entered into a stipulation settling these matters. The stipulation provided that the vested property should be returned to petitioner, but that the Attorney General should retain the income increment thereon from the date of vesting to the date of the stipulation. On November 23, 1953, the Attorney General returned the vested property to petitioner in accordance with the stipulation. The property returned to petitioner included State and municipal bonds in the face amount of $88,000. The settlement stipulation also provided for the sale of petitioner's life interest in the trust to the Attorney General.

Representation of petitioner in these matters required that her attorneys do extensive preparatory work, make numerous appearances and arguments in court, and attend many conferences with departmental officials. Petitioner paid $67,800.72 to her attorneys in 1953, which was reasonable compensation for the services rendered.

Petitioner and her husband deducted $67,800.72 from gross income on their 1953 income tax return as legal expense. Respondent disallowed this deduction, but in recomputing petitioner's gain realized from the sale to the Attorney General of the life interest in the trust, respondent allocated to the basis of the life interest $8,594.81 of the total legal fees of $67,800.72.

OPINION.

OPPER, *Judge:* The enactment of section 23 (a) (2) [1] was not intended to change the firmly established distinction between current expenses and capital outlay. *Trust of Bingham* v. *Commissioner*, 325 U. S. 365. In *Bowers* v. *Lumpkin*, (C. A. 4) 140 F. 2d 927, certiorari denied 322 U. S. 755, "the court makes clear that the phrase upon which the petitioner here relies was not intended to abrogate the settled rule relative to expenditures in defense of title to property, and that such expenditures are capital items to be added to the cost of the property." *James C. Coughlin*, 3 T. C. 420, 423.

"The test accordingly seems to us to be whether prior to the amendment such a deduction as that now in controversy would have been permitted to a taxpayer admittedly engaged in carrying on a trade

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:
(a) EXPENSES.—
   *       *       *       *       *       *       *
(2). NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

or business. The application of that test shows that the defense-of-title rule had been repeatedly applied in the trade or business situation, and that such taxpayers were equally required to capitalize the outlay." *Harold K. Hochschild,* 7 T. C. 81, 87.[2] See, e. g., *Levitt & Sons* v. *Nunan,* (C. A. 2) 142 F. 2d 795; *Murphy Oil Co.* v. *Burnet,* (C. A. 9) 55 F. 2d 17, 26, affd. 287 U. S. 299; *Brawner* v. *Burnet,* (C. A., D. C.) 63 F. 2d 129; *Moynier* v. *Welch,* (C. A. 9) 97 F. 2d 471; *Porter Royalty Pool, Inc.,* 7 T. C. 685, affd. (C. A. 6) 165 F. 2d 933, certiorari denied, 334 U. S. 833.

Giving petitioner's claim its broadest scope, and assuming without deciding that the contest with the office of the Alien Property Custodian was one to "recover" petitioner's property and to safeguard and defend it rather than to acquire property whose ownership she had lost, it is clear that petitioner's right to the property itself was to some degree involved [3] and that her situation thus still falls within the rule. In essence, the litigation between petitioner and the Alien Property Custodian had as its subject only the petitioner's title to and possession of the seized property. Here there can be no question of a possible business expense since it is apparently conceded that petitioner was not engaged in any business. Cf. *Commissioner* v. *Speyer,* (C. A. 2) 77 F. 2d 824, affirming 30 B. T. A. 517, certiorari denied sub nom. *Helvering* v. *Speyer,* 296 U. S. 631. Nor is there here any element of attorneys' services for the recovery of income. The settlement expressly left all the income with the Attorney General.[4] See *Pennroad Corporation,* 21 T. C. 1087, affd. (C. A. 3) 228 F. 2d 329. All petitioner did at the most was to maintain successfully her position that she was entitled for an indefinite

---

[2] That case, to be sure, was reversed by a divided court (C. A. 2) 161 F. 2d 817, but on the theory that the entire expense was attributable to Hochschild's business activity resulting from his receipt of current income and, hence, was an ordinary and necessary business expense. See *Kornhauser* v. *United States,* 276 U. S. 145.

[3] Although petitioner says in her brief that the issue in the litigation was "whether [petitioner] was an 'enemy' who could not recover her vested property," she further describes it as involving:

"whether [petitioner's] presence in Germany * * * barred her from *recovering* the vested property * * * [and];

"whether * * * she had * * * a residence in the United States, and * * * was * * * thus entitled to *recover* the vested property * * * and

"whether certain acts * * * deprived her of any right to *recover* the vested property * * *" (Emphasis added.)

Except for the "recovery" thus in issue the Alien Property Custodian's right to absolute title and to deal with the property as owner is unmistakably apparent. See, e. g., Trading with the Enemy Act, sec. 12. *United States* v. *Borax Consol.,* (N. D., Cal.) 62 F. Supp. 220.

[4] Respondent has nevertheless conceded that an allocation of the fees should be made so that the amount attributable to income will be deductible. He says: "It is suggested that if the Court indicates the method, the determination of the amount of the fee allocable to the claim for taxable income and related adjustments be left to stipulation by counsel for the parties * * *." This concession will, of course, be given effect and the only reasonable method apparent to us is to permit deduction of that proportion of the fee which the claim to taxable income, if eventually successful, would have borne to the total claim. This computation may be submitted in the proceeding under Rule 50.

period into the future to possession and ownership of the property to which the litigation related.

It is not clear to what extent petitioner is here contending that one purpose of the litigation was apart from and beyond the specific matter of possession and title to the property and involved the clearing of petitioner's status as that of an "enemy." But even if made, such an argument could not avail her since the objective described would then be purely personal and an expressly forbidden deduction under section 24 (a) (1). See *Lykes* v. *United States*, 343 U. S. 118.

Some confusion is no doubt engendered by the words employed to carry into effect the purpose of section 23 (a) (2). The phrase "conservation, or maintenance of property," severed from its context, may sound as though it were intended to cover a defense of title. But the cases indicate that the maintenance and conservation of capital assets to which the statute refers relates primarily to the protection of the physical property and not to the right or title of the taxpayer with respect to it. And this is as true respecting a claim arising subsequent to acquisition as in the case of one which constituted a previously existing cloud on title. See, e. g., *George W. Wetherbee*, 20 B. T. A. 35, reversed sub nom. *Bliss* v. *Commissioner*, (C. A. 5) 57 F. 2d 984; *Agnes Pyne Coke*, 17 T. C. 403, affirmed per curiam (C. A. 5) 201 F. 2d 742; *Helvering* v. *Stormfeltz*, (C. A. 8) 142 F. 2d 982; *E. J. Murray*, 21 T. C. 1049, affd. (C. A. 9) 232 F. 2d 742, certiorari denied 352 U. S. 872; *James C. Coughlin, supra.* See also *Virginia Hansen Vincent*, 18 T. C. 339, reversed on other grounds (C. A. 9) 219 F. 2d 228; *Mercantile National Bank at Dallas*, 30 T. C. 84. The most recent statement, *Lewis* v. *Commissioner*, (C. A. 2) 253 F. 2d 821, affirming 27 T. C. 158, is:

The taxpayer now urges that the expenses incurred by him in defending his title are deductible under Section 23 (a) (2). In support of this argument he urges that a distinction must be drawn between expenditures incurred in perfecting title to property, which taxpayer apparently concedes to be nondeductible; and expenses incurred in defending title. This distinction is untenable under the authorities. *Levitt & Sons* v. *Nunan*, * * *; *Bowers* v. *Lumpkin*, * * *; *Croker* v. *Burnet*, 62 Fed. (2d) 991 (D. C. Cir. 1933). Whether the suit is to perfect or to defend title the expenses are a capital item rather than an income deduction. * * *

It would be idle to suggest that all the authorities in this field can be reconciled. See Brookes, "Litigation Expenses and the Income Tax," 12 Tax L. Rev. 241. But essentially the distinction among the cases permitting or denying deduction can be inferred. It is that where specific income is involved the expense is deductible, whereas

where all income for the indefinite future depends upon the result,[5] this is a part of the bundle of rights of possession and ownership, is essentially capital in nature, and does not engender a deduction properly allocable currently to any limited year or taxing period. Thus in *Safety Tube Corporation*, 8 T. C. 757, affd. (C. A. 6) 168 F. 2d 787, we denied such a deduction, with this statement (p. 763):

Seaton claimed for himself and associates a participating interest in petitioner's commercial use of the patent. This claim and the expenses incurred in resisting it bore no special relation to 1940 or any other year. Seaton demanded part or all of the earnings of the business for all years, a right in or to the income-producing asset that petitioner resisted, not a claim against specific income therefrom.

Similarly, in *Louisiana Land & Exploration Co.*, 7 T. C. 507, affd. (C. A. 5) 161 F. 2d 842, we said (p. 515):

The distinction between capital expenditures and business expenses is generally made by looking to the extent and permanency of the benefit derived from the outlay. The benefit from business expenses is generally realized and exhausted within a year and the expense is therefore said to be of a recurring nature. * * * On the other hand, an item of expense is of a capital nature where it results in the taxpayer's acquisition or retention of a capital asset, or in the improvement or development of a capital asset in such a way that the benefit of the expenditure is enjoyed over a comparatively lengthy period of business operation. * * * A capital expenditure is thus nonrecurring, even though many similar expenditures are made by the taxpayer. The one-year period referred to above is not, of course, a touchstone to be arbitrarily applied, but is resorted to in definition as an aid in expressing the distinction.

We conclude that the present situation is no different from those in which it has repeatedly been held that expenses incurred in defense of title must be capitalized and are not deductible as current items. On this issue we view respondent's determination as correct.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

WITHEY, *J.*, dissents.

———

FISHER, *J.*, dissenting: The majority opinion bases its conclusion largely upon the proposition that the attorneys' fees incurred to contest the seizure and forfeiture by the Alien Property Custodian of claimant's property (the claimant asserting that the property was unjustly detained by such Custodian) represented cost of defense of title. To my mind, that approach, in effect, merely assumes the

---

[5] That this was the case here cannot be questioned. "As a practical matter, [petitioner's] payments to her counsel were certainly made *for* the collection of income, in the sense that the outcome of the litigation reached into the future, and assured her of continuing income from the date of return [of the property]. * * *" (Petitioner's brief, p. 18.) Such a statement, incidentally, could be made as to any proceeding to obtain, defend, or protect title.

answer. I think the problem is one of practical application of the tax laws in an unusual setting, but one well removed from the ordinary concept of defense of title.

The Trading With the Enemy Act was not an uncommon war measure. It authorized the Attorney General to issue vesting orders, seizing the property of persons who were *inter alia* German nationals, where the national interest of the United States required the seizure of the property of such persons. No doubt the great majority of such seizures were proper, but it was obviously anticipated that in many instances ultimate decision might determine that all or part of the property seized be returned. The person whose property was seized was, therefore, given the right and opportunity within the period prescribed in the Act to seek the return of the property seized. There was a provision for a time limit for making such claim, and, of course, the burden of proof was placed upon the claimant. The purpose of such provisions was to relieve the Government from the necessity of establishing the right to the seizure in many cases in which no claim would be filed and, where timely claim was filed, to put the onus upon the claimant, who would presumably have ready access to the facts and circumstances upon which he relied.

Pending the outcome on the merits, it was, of course, necessary to provide that some agency (in this instance, the Alien Property Custodian) sequester, conserve, control, and administer the property seized. It is clear, however, that the interest of the person whose property was seized did not terminate with the seizure. His right to substantiate his position was preserved unless and until either the time for filing claim had passed or, if claim was timely filed, final adverse decision on the merits.

To my mind, in prosecuting his claim, the person whose property was seized was not in any realistic sense defending title under circumstances usually present in the "defense of title" type of case. In the instant case, no issue is raised as to whether title was in claimant at the time of seizure. The rights of the claimant revolved around the question of whether or not she was an enemy national under the Act. In the interim, of course, it was necessary that the Alien Property Custodian have appropriate duty, power, and authority to deal with the property seized, without which provision there would have been either chaos or an absolute seizure without the saving opportunity of demonstrating ultimately that the seizure was in error.

Under the facts indicated above, I do not think the decisive factor may be permitted to rest upon the generalized use of the words "defense of title to property" because, to my mind, the use of the quoted words is not appropriate to the circumstances. It seems to me that the claimant was merely pursuing her statutory right to prevent (if she could prove her case) the ultimate confiscation of her property,

and that her action in so doing was one of conservation of her basic interest in the property within the meaning of section 23 (a) (2).

I agree with the majority statement that "the enactment of section 23 (a) (2) was not intended to change the firmly established distinction between current expenses and capital outlay." The general recognition of this distinction, however, does not dispose of the problem of category. The majority opinion rests its view that the expenditure was a capital outlay (except as to the allocation of a ratable share to the income factor) substantially on the theory that the expenditures were in defense of title as above indicated. Again it is my view that this approach is neither practical nor realistic. No doubt the result as projected by the majority view would be a pro rata application of the attorneys' fees (to the extent determined to be capital) to increase *pro tanto* the basis of each item of the property ultimately returned to the petitioner. I do not find any support for this view where attorneys' fees are paid to prosecute a claim in order to prevent ultimate confiscation of property where no issue as to petitioner's title at the time of the original seizure is raised. I would view the case otherwise, of course, if the circumstances brought the case in fact within the "defense of title" rule. If a catch phrase is necessary, however, to project the problem before us in the instant case, I would use the words "preservation and protection of interests in property." It may be added that the words "preservation" and "protection" are encompassed within the meaning of the word "conservation." See Webster's New International Dictionary (2d ed.) p. 568, which defines conservation as a "conserving, preserving, guarding, or protecting, a keeping in a safe or entire state; preservation."

The mere fact that the property in question consisted of capital assets does not require the conclusion that expenditures for its preservation or protection must be capitalized. Such a view would, in my opinion, be in conflict with *James H. Knox Trust*, 4 T. C. 258 (1944), in which commissions paid to testamentary trustees out of the corpora of testamentary trusts based on a percentage of receipts and disbursements of trust assets (in accordance with local law) were held deductible from gross income of the trusts under section 23 (a) (2) of the Code. In that case, although respondent argued that the payments were in effect a charge upon the properties and as such constituted a capital expenditure, and although the payments were actually made out of corpus, we held them to be deductible as expenses "for the management, conservation, or maintenance of property held for the production of income" within the meaning of section 23 (a) (2).

I realize that the distinction between capital expenditures and current expenses may not always be drawn with precision. Nevertheless, a classification of the payment of the legal fees actually in

issue, in one category or the other, is essential to the decision in the instant case. In my judgment, the attorneys' fees paid for legal services in the single matter of the prosecution and settlement of the claim to the return of the seized property, partake of the essence of ordinary and necessary current expenses for specific acts looking to the immediate conservation of an interest in property rather than of capital expenditures to be allocated in some manner to basis. The only suggested supporting principle to the contrary is the "defense of title" principle which, to my mind, for the reasons already explained, is not here applicable.

In addition to the foregoing expression of my own views, I concur in the dissenting opinion of Judge Forrester.

PIERCE, FORRESTER, and TRAIN, *JJ.*, agree with this dissent.

---

FORRESTER, *J.*, dissenting: I must respectfully disagree with the majority opinion which I feel has used the easy and here false touchstone of "defense of title" to arrive at a result which ignores realities.

I feel that the Attorney General's actions in this case did not take or question Mrs. Ruoff's title as such—indeed they confirmed and recognized it, much in the nature of a condemnation proceeding—but did question her activities and therefore her status. It is true that had she done nothing or had she defended against the vesting order unsuccessfully, her title would have passed to the Attorney General, but the important consideration is that title would not pass *until that point in time.*

Secondly I do not feel that either the taxing statutes or the Commissioner's regulations here involved require or intend further capitalization treatment after taxpayer has once acquired a perfect and unquestioned title.

In order to further develop my point mentioned first above, I feel that a fuller statement of the facts relating to the Attorney General's vesting order is required.

It is true that petitioner remained in Germany during World War II even though as an American citizen she was entitled to apply for repatriation; however, her husband and her children were at that time German citizens and could not have left Germany because of the war. At the termination of hostilities petitioner applied for and received a United States passport and returned to the United States where she has remained since except for a short journey abroad in 1947.

The Attorney General's Vesting Order issued on September 23, 1948, and amended on October 1, 1948, was issued pursuant to the Trading With the Enemy Act, 40 Stat. 411, 50 U. S. C. appx. sec.

1, as amended; Exec. Order No. 9193, 7 Fed. Reg. 5025 (1942), as amended; and Exec. Order No. 9788, 11 Fed. Reg. 11981 (1946). This order (1) found petitioner to be a citizen of an enemy country (Germany), (2) *found petitioner to own or control or that there was deliverable to her the above-mentioned property located in the United States*, (3) determined that the national interest of the United States required that petitioner be treated as a national of a designated enemy country (Germany) and (4) "vested" in the Attorney General all of the above-mentioned property.

Section 7 (c) of the Trading With the Enemy Act, 40 Stat. 418 (1917), 50 U. S. C. appx. sec. 7 (c), provides *inter alia*, that the "sole relief and remedy" of any person having any claim to any such property is that provided by the Act.

By Executive Order No. 9095, 7 Fed. Reg. 1971 (1942), as amended by Executive Orders No. 9193 and 9567, 7 Fed. Reg. 5025 (1942), 10 Fed. Reg. 6917 (1945), the President established the Office of Alien Property Custodian and, among other things, authorized the Alien Property Custodian to vest the property of nationals of Germany. Executive Order No. 8389, as amended by Executive Order No. 8785, 6 Fed. Reg. 6348 (1941), defines a national of a foreign country as including any person who, at any time on or after June 14, 1941, was "domiciled" in Germany. By Executive Order No. 9788, 11 Fed. Reg. 11981 (1946), the President abolished the Office of Alien Property Custodian and transferred the authority of the Alien Property Custodian to the Attorney General.

Section 12 of the Trading With the Enemy Act, 40 Stat. 423 (1917), 50 U. S. C. appx. sec. 12, provides that with respect to property taken under that Act, the Alien Property Custodian (i. e., the Attorney General)—

shall be vested with all of the powers of *a common-law trustee* * * * and, in addition thereto, * * * shall have power to manage such property and do any act or things in respect thereof or make any disposition thereof * * * by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto or to the ownership thereof *in like manner as though he were the absolute owner thereof:* * * * [Emphasis supplied.]

The Custodian's power to dispose of vested property by sale or otherwise as provided above was, however, limited by section 9 (a), 40 Stat. 418 (1917), 50 U. S. C. appx. sec. 9 (a), which provides that if an action is commenced against the Custodian under the provisions of section 9 (a), quoted below, for the return of specific vested property—

then such * * * property shall be retained in the custody of the Alien Property Custodian, * * * until any final judgment * * * in favor of the claimant shall be fully satisfied * * * or until final judgment * * * shall be entered against the claimant or suit otherwise terminated.

The sole remedies of any person whose property has been taken under authority of the Trading With the Enemy Act, as provided in such Act, are found in sections 9 (a) and 32 (a), 60 Stat. 51 (1946), 50 U. S. C. appx. sec. 32 (a). Section 9 (a), in pertinent part, provides:

> *Any person not an enemy* * * * claiming any interest, right, or title in any * * * property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder * * * may file with the said custodian a notice of his claim under oath * * * and the President, if application is made therefore by the claimant, may order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held * * * to which the President shall determine said claimant is entitled: * * *. If the President shall not so order within sixty days after the filing of such application or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may institute a suit in equity in the Supreme Court of the District of Columbia or in the district court of the United States for the district in which such claimant resides, * * * to establish the interest, right, title, * * * so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian * * * to which the court shall determine said claimant is entitled. * * * [Emphasis supplied.]

Section 32 (a) (2) (C) provides, in pertinent part, that the President or his delegate, may return any property vested in, or transferred to, the Alien Property Custodian upon the filing of notice of claim therefore, if the claimant is not "an individual * * * resident at any time since December 7, 1941, within the territory of * * * [Germany], other than a citizen of the United States * * *." But, a return under section 32 (a) can be made only if it is determined "that such return is in the interest of the United States." 60 Stat. 52 (1946), 50 U. S. C. appx. sec. 32 (a) (5).

1. Considering now the first proposition noted above, respondent maintains that petitioner is not entitled to deduct legal fees paid to *reacquire* the vested property which admittedly had formerly belonged to her, arguing that such fees are nondeductible capital expenditures. Petitioner contends that the activities of her attorneys constituted the *conservation* of property held for the production of income, maintaining that her expenditures were not for the purpose of *perfecting* title but instead were to free the property from the possible effects of the claims of the Attorney General regarding her status under the Trading With the Enemy Act.

Questions concerning the deductibility of expenditures under section 23 (a), and of the necessity for capitalization of expenditures under section 24 (a) (2),[1] have arisen in many ways and concerning,

---

[1] SEC. 24. ITEMS NOT DEDUCTIBLE.

(a) GENERAL RULE.—In computing net income no deduction shall in any case be allowed in respect of—

* * * * * * *

(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate;

affecting or being affected by almost every conceivable type of property, property rights and interests or expectations of interest therein. The results reached by the courts deciding these questions are almost as many and varied as the factual situations in the various decided cases. This is a natural result and one to be expected to flow from statutes and regulations dealing with such complex concepts as *preservation* of capital and *perfection* of capital.

The instant question of deductibility, or necessity for capitalization, of expenses incurred in contravention of a vesting order under the Trading With the Enemy Act is one of first impression. In order to answer this question we must first understand the exact nature and legal consequences upon property rights of such a vesting order and then apply this understanding in the light of the adjudicated cases concerning deductibility and capitalization.[2]

Respondent cites the following authorities for the proposition that the Attorney General's act of vesting petitioner's property in the United States pursuant to the Trading With the Enemy Act immediately divested petitioner of title and of every beneficial right to, or interest in, the property. *Cummings* v. *Deutsche Bank*, 300 U. S. 115 (1937); *United States* v. *Borax Consol.*, 62 F. Supp. 220 (N. D. Cal., 1945); *United States* v. *Silliman*, 65 F. Supp. 665, 673 (D. N. J., 1946); and *Clark* v. *Tibbetts*, 167 F. 2d 397 (C. A. 2, 1948). Careful examination of these authorities cited by respondent reveals that they do not support the proposition attributed to them; indeed I have found no case supporting this proposition.

In *Cummings* v. *Deutsche Bank*, *supra*, language in the opinion includes, *inter alia*, at page 120:

Alien enemy owners were divested of every right in respect of the money and property seized and held by the Custodian * * *. The title acquired by the United States was absolute * * *. Congress intended after the war justly to deal with former owners * * *. But that intention detracted nothing from title acquired by the United States * * *

As of what point in time was the Supreme Court speaking? The facts were that this was a suit in equity brought in 1934 as to property which had been "vested" during World War I. The suit was brought not under section 9 of the Trading With the Enemy Act but under section 11 of the Settlement of War Claims Act of 1928, the scheme of which was a grant to former enemy aliens of the privilege of becoming entitled, upon conditions specified, to have their property returned to them. This privilege was postponed in 1934 by Public Resolution No. 53 (48 Stat. 1267) because Germany was then in default to the United States under the debt-funding agreement of 1930.

---

[2] Respondent contends that having lost title to the vested property, petitioner has nothing to which her expenses can be related. This argument avails nothing for even respondent admits that petitioner immediately gained the procedural rights specified in the Trading with the Enemy Act.

The Supreme Court properly held that this grant was made as a matter of grace and could therefore be withdrawn. It is now clear that the rule of this case and the language quoted above respect an *admitted* enemy alien against whom the original vesting order *had* "become complete" either by prescription or by final judgment.

The case of *United States* v. *Borax Consol.*, *supra*, involved a motion to dismiss a Sherman Act complaint made by American Potash and Chemical Corporation, an essential party to an alleged conspiracy under said Act, on the ground that 90 per cent of its stock, and therefore effective control of the corporation, was no longer held by enemy aliens but had been vested by the Alien Property Custodian almost 2 years before the issuance of the complaint. The court overruled the said motion on the ground that the stock might be returned and that it was impossible to forecast the corporation's future activities from the pleadings. The court quoted some of the above-noted language from *Cummings* v. *Deutsche Bank*, *supra*, but it cannot fairly be said that the court was not speaking as of a point in time after the vesting order had "become complete" by prescription or final judgment.

In *United States* v. *Silliman*, *supra*, the complicated facts are that the property of one J. F. Hackfeld was "vested" in 1918. Hackfeld, born in Germany, had assisted in overthrowing the Monarchy of Hawaii in 1894 and therefore been issued a certificate entitling him to privileges of citizenship of and by the Republic of Hawaii and he therefore claimed to be a United States citizen because of the Act of 1900 which provided that all citizens of the Republic of Hawaii were thereafter United States citizens.

Between 1900 and 1914 Hackfeld divided his time between Germany and Hawaii and he was in Germany at the outbreak of and during the war.

Hackfeld retained Silliman to represent him as his attorney in 1923 and as the result of claims filed by Silliman, fraudulently representing Hackfeld as a United States citizen, President Coolidge allowed Hackfeld's claim in 1924.

This suit against Silliman sounds in fraud and seeks damages in the amount of Presidential allowance.

One of Silliman's defenses was that the alleged cause of action accrued in 1924 and was therefore barred by the statute of limitations. In ruling against this contention, the court held that the United States was acting in its own behalf (and not as a trustee) and that consequently statutes of limitations were ineffective. *Cummings* v. *Deutsche Bank*, *supra*, is cited in support.

An exact statement of the facts again makes it clear, first that this court was dealing with an *adjudicated* enemy alien and, second, that the vesting order issued in January 1918 had long since "*matured*" before claim was filed in October 1923.

The case of *Clark* v. *Tibbetts*, *supra*, lends no support to respondent's proposition.

Again the facts are complicated. One Mary Martha Taylor in 1932 made a will leaving a bequest outright to one of four attorneys who should survive her and at the same time entered into a secret written agreement with them that the taker would convey the property received to Mrs. Taylor's illegitimate daughter, Mrs. Sakrausky, or her issue. Mrs. Taylor died in 1943, whereupon one of the four lawyers, Tibbetts, became vested, and months thereafter and before Mrs. Taylor's will was admitted to probate, Tibbetts died.

The secret agreement of 1932 received notoriety in a New York Surrogate's Court action between Tibbetts' personal representative and the next named of Mrs. Taylor's four lawyers and the Attorney General, believing that Mrs. Sakrausky and her issue were enemy aliens, issued vesting orders against her and her issue and filed this declaratory judgment action to have established that a constructive trust existed in their favor.

In resisting this action the defendants (Tibbetts' executrix and George F. Lewis, the second of the four lawyers named by Mrs. Taylor) urged that the nationalities of Mrs. Sakrausky and her issue were an issue. This court properly held that only claimants were given remedies under section 9 (a) of the Trading With the Enemy Act and that since the defendants here were third-party strangers, their point was not well taken.

It is obvious that no understanding of the exact nature and legal consequences upon property rights of a vesting order, *at the time of its issuance*, is gained from respondent's cited cases. Such understanding is gained from the opinion in *Stoehr* v. *Wallace*, 269 F. 827, affd. 255 U. S. 239. Judge Learned Hand, speaking for the District Court, stated:

Under section 7c the President may seize all property which he decides to have enemy character, and under section 7e all who comply with his demands get immunity in all courts. But nothing is settled by the capture itself except *bare sequestration* of the property in the hands of the Alien Property Custodian.

Thus it is apparent what the scheme of the act was. The reduction to possession of enemy property should be absolute, final and incontestable; it was to proceed by ex parte investigation and without right of review; it should include all property that the Alien Property Custodian decided to have enemy character. But it adjudicated nothing and its effect upon any right *but that of possession* was nil. In a suit under section 9 the investigation and decision are irrelevant. Instead of an original libel of information to condemn the property upon capture, which places the initiative upon the captor, the initiative in restoration is given to claimant friends, who, as soon as they choose within a fixed period, may reclaim under section 9; until they do the Alien Property Custodian is free to manage and even to sell under section 12 as amended. In the reclamation suit the validity of the capture is for the *first time* to be tested, and the question of title to be adjudicated. If the fixed

period passes without any suit, the title by capture becomes good by a kind of prescription or limitation. [Emphasis supplied.]

In an earlier opinion, *Kahn* v. *Garvan*, 263 F. 909, Judge Hand stated:

The act intends the *immediate reduction to possession* of all property which the Custodian shall decide to be enemy property; all questions arising from his mistakes, or even from his oppressive or arbitrary action, are relegated to suits under section 9. By the capture *nothing is condemned, nothing confiscated, nothing concluded.* The citizen runs only the risk of temporary dispossession through the misprision of the officials; not *always a light matter* it is true, but a necessary incident of war. \* \* \*

  \*   \*   \*   \*   \*   \*   \*

The purpose [of the Act] was to accomplish a swift, certain, and final *reduction to possession* of vast quantities of property involved in incredible complication of ownership and interest. That purpose could be accomplished only at the sacrifice of much that custom had made sacred; with its propriety courts have nothing to do; they may only learn what it was, and consider whether the constitutional limitations were observed. \* \* \* [Emphasis supplied.]

A similar interpretation of the effect of the Alien Property Custodian's vesting power on property relationships appears in the recent case, *In the Matter of the Trust Estate of H. Renjes, Deceased*, 42 Haw. 151 (1957).

These cases lead me to the clear conclusion that a strict application of the language of respondent's cited cases is not warranted as to those whose enemy status is not finally determined and the vesting order "matured." This is not to say that prospective determination of the legal effect of an act of the sovereign, and therefore the rights, detriments, and remedies of the one proceeded against, shall depend upon ultimate resolution of the very fact there in issue, for that would beg the question; it is rather to put into proper perspective the guideposts furnished us by the adjudicated cases. I feel the conclusion is inescapable that title, as such, passes for the first time at the final conclusion in favor of the Government of claimant's remedial actions under the Trading With the Enemy Act or when the prescriptive time under such Act has run.

In the instant case petitioner immediately took the prescribed protective steps and her status—the only issue really in question—*was never judicially determined.* The stipulation settling her civil suit against the Attorney General resulted in the return to her possession of the *very property* which had been seized. *Only interest* was retained by the Attorney General. I feel it is crystal clear that the procedures availed of by the Attorney General in obtaining swift *possession* of petitioner's property should not be permitted to upset normal property concepts but choose rather to think of the Attorney General's actions as a sequestration and petitioner's remedy in the nature of a suit in replevin. See *Duisberg* v. *Crowley*, 54 F. Supp. 365. Petitioner's

claim and civil suit therefore consisted of a demand for return of property unjustly detained rather than for reconveyance of title.

From a tax standpoint, this conclusion would seem to be correct. For if we follow respondent's theory to its logical conclusion, we would have to assume that petitioner sustained a loss in the amount of her pre-September 23, 1948, basis as the result of the Attorney General's vesting order of that date. Likewise, upon reacquiring the property in 1953, petitioner would obtain a basis for the property equivalent to her post-September 23, 1948, expenses. This would consist solely of legal fees and expenses allocable to the acquisition of title. Sec. 113 (a) (1).

This result is obviously not intended by the statute, nor do we understand respondent to press the analogy of his cited cases to this extent. Thus, in determining petitioner's gain from the sale of her life estate in the Hiebler Trust (the trust established by petitioner in 1927) pursuant to the settlement stipulation, respondent allowed petitioner a basis for determining gain computed by adding petitioner's pre-September 23, 1948, basis and the portion of legal fees attributable to the recovery of possession of this life estate. We therefore can only assume that respondent does not regard the vesting order as wiping out petitioner's ownership of the vested property to the extent that a loss was sustained by her in 1948.

2. Having therefore determined that petitioner did not reacquire title to the property in 1953, the next question becomes whether or not petitioner made capital expenditures measured in the amount of the legal expenses paid during that year. In order to answer this question we must look to section 24 (a) (2). This section defines capital expenditures as "[a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." While it, of course, is not sufficient as a matter of burden of proof for petitioner to show that the expense in question was not a capital expenditure, still, where the agreed-upon correlative to disallowance of the deduction is capitalization of the expense, then the capital-expenditure section should be examined as an aid to decision.

Applying section 24 (a) (2) to the facts found herein, I come to the conclusion that petitioner's post-November 23, 1953, ownership of the vested property is no better in either quality or quantity than her pre-September 23, 1948, ownership of the same property. It can, of course, be argued that petitioner's post-November 23, 1953, title to the vested property was a better title than were those remedial rights granted her under section 9 (a) of the Trading With the Enemy Act during the period the property was vested in the Attorney General. Certainly from the standpoint of property valuation this would be true. However, where such an approach is used in support of a

theory of capitalization of the costs of litigation it would also seem necessary for the sake of consistency to hold that petitioner sustained a loss at some point of time during the period the property was vested in the Attorney General.[3]  The equality of petitioner's pre-September 23, 1948, title and her post-November 23, 1953, title must be admitted, therefore it is difficult to reach any other conclusion.  The measure of the loss would be petitioner's costs in regaining an equal title.

The trouble with this approach is that, at least from a tax standpoint, the costs of litigation are more akin to expense items than to capital improvements.  The aspect of purchase is absent; also absent is a disposition of the vested property prior to November 23, 1953, sufficient to permit the computation of loss unless, as in *Vincent* v. *Commissioner*, 219 F. 2d 228 (C. A. 9, 1955), reversing 18 T. C. 339, we measure the loss by the occasioned necessary expenses.

I prefer instead to think of petitioner's litigation expenses in terms of section 23 (a) (2).  Since these expenses were for the purpose of *conserving* and *maintaining* petitioner's income-producing property and inasmuch as they were *not* for the purpose of *improving* or *enhancing* the value of, or changing in any way petitioner's ultimate title to, such property, I can see no reason for applying the misnomer, capital expenditures, to such expenses.

I find a close analogy to this situation in condemnation cases and cases of regulatory orders, in each of which the sovereign takes actions which if unsuccessfully resisted or circumvented would result in loss of title or of value.  In *L. B. Reakirt*, 29 B. T. A. 1296 (1934), affirmed per curiam 84 F. 2d 996 (C. A. 6, 1936), the City of Cincinnati had lawfully condemned a 25-foot strip of petitioner's land and had attempted to take an additional adjacent area by way of "excess condemnation."  Petitioner successfully resisted the "excess condemnation" and the dispute arose out of the disallowance of his expense treatment of his attorneys' fees, the Commissioner contending for capitalization.

In allowing expense treatment, this Court said at pages 1297 and 1298:

We next note that the litigation was not in defense of title or to perfect petitioner's title.  It was to enjoin the taking of the land itself by the exercise of the power of condemnation, a right of sovereignty.  Petitioner's title was assumed to be valid and the effectiveness of the condemnation, if successful, *would have depended on the validity of petitioner's title.*  The decision of the Supreme Court perpetually enjoining the condemnation did not add one cent to the value of petitioner's property, nor did it add any rights of title.  We are unable to follow respondent in arguing that the expense so incurred was a capital expenditure.  [Emphasis supplied.]

\* \* \* \* \* \* \*

---

[3] See *Vincent* v. *Commissioner*, 219 F. 2d 228 (C. A. 9, 1955), reversing 18 T. C. 339, where the court found a deductible loss by embezzlement.

\* \* \* it is undoubted that petitioner could have employed a watchman to remain on this very property to prevent unlawful entry or misuse by trespassers. An expenditure for such a purpose would have been an ordinary and necessary expense and allowable as such. Similarly, it would seem that if court action were necessary to oust a trespasser and a lawyer were employed to eject him, the fee paid would be a comparable expense of the business. \* \* \*

In *Brown-Forman Distillers Corp.* v. *United States*, 132 F. Supp. 711 (Ct. Cl., 1955), the distillery owned both sides of Howard Street in Louisville, Kentucky, and, consequently, under Kentucky law therefore owned the fee to the street, which fee, however, had been permanently dedicated to the city.

During 1948 the Louisville board of aldermen passed a resolution permanently closing the street and the city attorney then filed suit to dispose of certain formalities which he considered necessary (although taxpayer disagreed) and in this lawsuit certain third persons were made parties.

Taxpayer considered that none of these third parties had any valid claim to title to the street, but in order to save time and get the matter settled, it paid $7,500 to the attorney representing them, paid $2,000 directly to one of them, and paid a fee of $500 to the city attorney, all of which $10,000 it treated as an expense item on its income tax return, to which action the Commissioner disagreed, contending for capitalization.

In allowing expense treatment, the court stated that if paid in acquisition of property it should be capitalized but if paid in the protection of an existing property right it should be deducted as an expense, and held that in this case the $10,000 was a deductible and necessary expense "for the permanent protection of its property \* \* \*." "The payment of $9,500 [to adverse claimants] by plaintiff added not one cent of value to the property." The court cites and relies upon *Commissioner* v. *Reakirt*, 84 F. 2d 996; *Bliss* v. *Commissioner, infra;* and *Kornhauser* v. *United States, infra.*

The case of *Campbell* v. *Fields*, 229 F. 2d 197 (C. A. 5, 1956), involved survey and attorneys' fees in connection with the unitization of Texas oil lands, which fees the taxpayer attempted to expense and which the Commissioner contended should be capitalized.

In 1947, the Texas Railroad Commission had issued an order regulating the production of oil and gas which would have restricted taxpayer's production and profits, absent unitization treatment which facilitated proper spacing and secured the most scientific use of the natural reservoirs, etc.

In affirming the District Court which had allowed expense treatment, the court observed that the Government had conceded that the Texas restrictions with respect to spacing imposed an economic burden on operating except under pooling agreements and that economic

advantages were made possible by unitization. The Government contended that the taxpayer's leases represented a capital investment and that unitization had increased their capital value. The court observed, "This approach gives too much consideration to form and too little to substance. Let us examine the nature of the property right as was evidenced by the leases and the extent to which that right was changed by the pooling and unitization."

(Thus, in this case action of the sovereign, Texas, would have taken from the taxpayer a portion of the value of his property, his original title to which was undisputed. In Ruoff action of the sovereign would have deprived the taxpayer of all of her property, her original title to which was not disputed. The taxpayer here mitigated the effect of the sovereign's action by unitization, while the taxpayer in Ruoff mitigated the effect by resisting the "vesting order." In neither case was the taxpayer's original title questioned in any degree.)

This court states that the phrase in section 23 (a) "ordinary and necessary" is to be given its rational and practical meaning and that the probability that the expense will not recur does not prevent its being ordinary. It quotes with approval from *Deputy* v. *duPont*, 308 U. S. 488, "[A]n expense may be ordinary though it happen but once in the taxpayer's lifetime."

The court quotes at great length with approval from its former decision in *Bliss* v. *Commissioner*, *infra*, and states that the *Bliss* doctrine as applied to this case was not overruled by *Jones' Estate* v. *Commissioner*, *infra*.

The court also cites *Allen* v. *Selig*, *infra*, with approval.

Turning now to the second proposition set forth at the start of this dissent, I think it is clear that one of petitioner's objectives in her actions to prove that she was not an enemy was to recover her property which had been "vested." Insofar as her legal expenditures relate to this objective petitioner's case must therefore stand or fall upon the meanings of sections 23 (a) (2) and 24 (a) (2) and the regulations thereunder, none of which, in my view, requires or intends further capitalization treatment after taxpayer has once acquired a *perfect* title which is *unquestioned*.

Before discussing the precedents available, it should be pointed out that cases arising under the business deduction provision, section 23 (a) (1), and relating to expenditures to preserve or perfect title are relevant to our decision. Although the language of the two sections is not the same, it has been judicially determined that the business and the nontrade or nonbusiness deduction sections are comparable and in pari materia. *Trust of Bingham* v. *Commissioner*, 325 U. S. 365 (1945). It follows that deductions which are permitted to taxpayers in a trade or business will also be allowed to taxpayers who are technically not in a trade or business but who hold property for the

production of income. See H. Rept. No. 2333, 77th Cong., 2d Sess., 1942–2 C. B. 372, 410, 430; S. Rept. No. 1631, 77th Cong., 2d Sess., 1942–2 C. B. 504, 570.

*Trust of Bingham* v. *Commissioner, supra*, is the leading case in the litigation expense area and by analogy gives at least a partial answer to our problem. The issues involved there were whether a testamentary trust could deduct attorneys' fees paid by it in unsuccessfully resisting payment of an income tax assessed by reason of the payment of certain legacies in appreciated securities, and whether it could deduct other attorneys' fees incurred on final distribution of its assets. The Tax Court found that the trust property was held for the production of income, that all the items in question were ordinary and necessary expenses of the management of the trust property; and that the fees and expenses for contesting the income tax deficiency assessment were also for the conservation of the trust property. *Mary Lily Bingham Trust*, 2 T. C. 853.

On appeal the Court of Appeals for the Second Circuit (145 F. 2d 568) left undisturbed the Tax Court's findings to the effect that the questioned items were ordinary and necessary expenses for the management or conservation of the trust property. It however held that the expenses of contesting the income tax had nothing to do with the "production of income" and therefore were not deductible under section 23 (a) (2). The court also held that the expenses were not deductible because they were paid in connection with property held by the trustees "ready for distribution" and hence not for the production of income. Similarly, the legal fees paid in connection with the distribution of the trust fund to the proper legatees were held to not relate to the management of property held for the production of income, since the services were rendered after the property was ready for distribution.

The Supreme Court, in reversing, reasoned that the trustees were under a duty to hold and conserve the trust property, and until distribution, to receive income from it. It held that the Court of Appeals had erred in limiting the test of deductibility to situations where the fees related to the "production of income." Expenses are equally deductible where they are reasonable in amount and bear a reasonable and proximate relation to the management of "property held for the production of income." In sustaining the taxpayer's position concerning the deduction of attorneys' fees in connection with the unsuccessful contest of the income tax deficiency, the Supreme Court stated:

What we have said applies with equal force to the expenses of contesting the tax deficiency. Section 23 (a) (2) does not restrict deductions to those litigation expenses which alone produce income. On the contrary, by its terms and in analogy with the rule under § 23 (a) (1), the business expense section, the

trust, a taxable entity like a business, may deduct litigation expenses when they are directly connected with or proximately result from the enterprise—the management of property held for production of income. *Kornhauser* v. *United States, supra,* 152–153; *Commissioner* v. *Heininger, supra,* 470–471. * * *

The facts of the instant case are dissimilar, yet the theory of *Trust of Bingham* v. *Commissioner, supra,* is applicable. For instance, in interpreting the nontrade or nonbusiness deduction provision, the Supreme Court states:

The requirement of § 23 (a) (2) that deductible expenses be "ordinary and necessary" implies that they must be reasonable in amount and must bear a reasonable and proximate relation to the management of property held for the production of income. See H. Rep. No. 2333, 77th Cong., 2d Sess., p. 75; Sen. Rep. No. 1631, 77th Cong., 2d Sess., p. 88. * * *

The stipulation of facts in the instant case evidences the fact of payments in the year 1953 and that the payments were ordinary and necessary in the sense that they were reasonable in amount. Doubt exists only as to the reasonable and proximate relation of said payments to the management (or, by implication, conservation or maintenance) of property held for the production of income.

Respondent's position is that petitioner "lost her ownership" of the vested property on September 23, 1948, and that her expenditures were to "reacquire" title to the vested property. Petitioner's argument, although not too clear, is that the expenditures were to conserve her property. The idea of conservation, at least in theory, would negate the counter position of acquisition.

*Trust of Bingham* v. *Commissioner, supra,* again is helpful. We know from that case that the expenses of unsuccessfully contesting an income tax deficiency of a trust are deductible. Although the Court places some stress upon the relationship of the expenses of litigation to the duty of the trustees, acting as fiduciaries, to manage and protect the trust corpus, this relationship should have evidentiary value only. The statute does not differentiate between those nontrade or nonbusiness deductions which are permitted to a trust and those similar deductions which are permitted to a private taxpayer also holding property for the production of income, and paragraph (i) of Regulations 118, section 39.23 (a)–15, dealing specifically with fiduciaries' expenses of litigation, was first added immediately following this decision of the Supreme Court and in 1946. See T. D. 5513, 1946–1 C. B. 61. We are therefore not justified in making this distinction.

It suffices to point out that if the expenses of losing title or ownership to a part of the trust principal are held to be for the "management" of property held for the production of income, then the expenses incurred in successfully protecting title or ownership to investment or income-producing property should similarly be regarded as for the "conservation" or "maintenance" of property held for the production of income.

In contending for capitalization, respondent argues that his position is supported by Regulations 118, section 39.23 (a)–15 (k).⁴ Respondent's argument is that the lack of a comma between the words "property" and "and" within the parenthetical element has the effect of imposing a requirement that the investment property must be of such character as to be includible in income when recovered and that if not of that character, then the expenditures are not deductible expenses.

In testing this argument it will be of value to compare the above-quoted portion of the regulation with its other portions which treat of investment property and amounts of income and we find eight such examples ⁵ all of which show that respondent is not only asking for an interpretation of subsection (k) which is opposed to the ordinary sense and meaning of the words there used but is also opposed to the obvious treatment of "investment property" and "amounts of income" accorded by all other portions of this same regulation. Also, respondent's argument in effect assigns identical meaning to "investment property" and "amounts of income." I do not feel that any interpretation such as that asked by the respondent is justified.

Respondent also relies upon that portion of Regulations 118, section 39.24 (a)–2 (a), which reads, "The cost of defending or perfecting

---

⁴ REGULATIONS 118.

SEC. 39.23 (a)–15  *Nontrade or nonbusiness expenses.* * * *

*        *        *        *        *        *        *

(k) Expenditures incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. * * *

⁵ [1.] * * * an expense may be deducted * * * only upon the condition that:

(1) It has been paid * * * (i) for the production or collection of income which, if and when realized, will be required to be included in income for Federal income tax purposes, or (ii) for the management, conservation, or maintenance of property held for the production of such income; * * *

[2.] * * * (2) It is an ordinary and necessary expense for either or both of the purposes stated in subparagraph (1) of this paragraph.

[3.] * * * Expenses, to be deductible * * * must bear a reasonable and proximate relation to the production or collection of taxable income or to the management, conservation, or maintenance of property held for the production of income.

[4.] * * * Thus, any amount allocable to the production or collection of one or more classes of income which is not includible in gross income or to the management, conservation, or maintenance of property held for the production of such income is not deductible * * *

[5.] (e) * * * expenses of carrying on transactions which do not constitute a trade or business * * * and are not carried on for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income, but which are carried on primarily as a sport, * * * are not allowable * * *

[6.] (e) * * * The question whether or not a transaction is carried on primarily for the production of income or for the management, conservation, or maintenance of property held for the production or collection of income, rather than primarily as a sport, * * *

[7.] (g) Fees for services of investment counsel * * * paid * * * in connection with investments held by him are deductible * * * only if (1), they are paid or incurred by the taxpayer for the production or collection of income, or for the management, conservation, or maintenance of investments held by him for the production of income; * * *

[8.] (j) Reasonable amounts paid * * * for the services of a guardian * * * in connection with the production or collection of income * * *, or in connection with the management, conservation, or maintenance of property, held for the production of income, * * *

title to property constitutes a part of the cost of the property and is not a deductible expense."

We first note that this entire subsection (a) is introduced by the words "Amounts paid for *increasing* the capital value or for making good the depreciation \* \* \* of property are not deductible from gross income."  (Emphasis supplied.)

Next, comparing the language used by the Commissioner in Regulations 118, section 39.23 (a)–15, with his language employed in section 39.24 (a)–2, we find that the former reads: "[A]n expense may be deducted under section 23 (a) (2) only upon the condition that: \* \* \* or (ii) for the *management, conservation,* or *maintenance* of property held for the production of \* \* \* [taxable] income;" (Emphasis supplied.) while the language of the latter reads: "The cost of *defending* or *perfecting* title to property constitutes a part of the cost of the property and is not a deductible expense."  (Emphasis supplied.)  It is obvious that the two provisions can be harmonious only if the meaning of the latter is limited to those cases where the claimed expense sought to be deducted as such has in fact *increased, added to,* or *bettered* the value of the property upon which it was expended.  This also brings the portion of 39.24 (a)–2 upon which respondent relies into harmony with the first sentence of said section.

To attempt to bring the quoted language of section 39.23 (a)–15 into harmony with any other meaning of the quoted portion of section 39.24 (a)–2, relied upon by respondent, could result only in the complete obliteration of the quoted part of section 39.23.

The meaning which I have attributed above to the quoted portion of section 39.24 results in the word "or" being read as a conjunction, thus giving to the word "defending" approximately the same meaning as the word "perfecting" for here the word "perfecting" obviously means making perfect that which had previously been imperfect, thereby adding to and enhancing the value of the previously imperfect title to property.  If read "defending and perfecting," the phrase comes into harmony with the plain meaning of the statutes, the other portions of section 39.24 (a)–2 and of section 39.23 (a)–15.

It would be erroneous to state that my views on the deductibility of the costs of protecting or conserving title go seemingly unchallenged by the decisions, but, as previously observed, each of the cases in this field is in a sense sui generis, and there is substantial support for my conclusions; also I note that without substantial exception, the decisions which have used the touchstone of "defense of title" to require capitalization treatment involve factual situations where the title, *at the time of taxpayer's original acquisition,* was, or was alleged to be, clouded.  I do not quarrel with the results reached by these decisions for in either event the perfection of taxpayer's orig-

inal title is questioned and in issue, but I disagree strenuously with the proposition that title, being any way involved, requires capitalization treatment, for I feel that no taxpayer should be required to capitalize further after having once acquired a perfect and unquestioned title and I do not believe either the statutes or the regulations so intend.

The taxpayer in *Hochschild* v. *Commissioner*, 161 F. 2d 817 (C. A. 2, 1947), reversing 7 T. C. 81, was an officer, director, and substantial stockholder of the American Metal Corporation. He personally participated in ventures which that company 'had undertaken, notably the organization of the highly successful Climax Molybdenum Company. A stockholder's derivative suit sought to impress a trust upon the taxpayer's Climax stock, an accounting for damages and profits, and an accounting in respect of Climax shares which the taxpayer no longer held. The suit was ended in the taxpayer's favor and he sought to deduct the expenses incurred. The applicable deduction provision was section 23 (a) (1). In allowing the deduction, the Court of Appeals for the Second Circuit said:

We cannot agree that these fees which the petitioner paid in defense of the lawsuit were any the less deductible because his liability, if proved, might have destroyed his equitable title to the stock he held. His right to keep it was certainly in issue and in that sense his title to it was defended, to be sure, but the title as such was not *perfected* in any way by his expenditures for legal assistance. He thereby but fended off an abortive attack upon the conduct of his business as a fiduciary and by freeing himself from liability to his corporation to account for such conduct put all of his property beyond the reach of his then accusers. * * * [Emphasis supplied.]

The instant case differs from *Hochschild* v. *Commissioner, supra*, in that petitioner's income-producing property was seized by the Attorney General pursuant to the compulsory provisions of the Trading With the Enemy Act while the taxpayer in *Hochschild* maintained possession of the disputed Climax stock. This difference permitted the taxpayer in *Hochschild* to defend against the accusations of the aggrieved stockholders while here petitioner was required to file claim and bring suit against the Attorney General in order to regain possession of the vested property which allegedly was being wrongfully withheld from her.

The two cases also differ in that petitioner, in the instant case, sought to protect her title to specific property, i. e., the vested property, while the taxpayer in *Hochschild* v. *Commissioner, supra*, sought to protect his title to the general assets of his personal estate as well as specific Climax stock. This difference was suggested as a ground for distinguishing the deductibility of the expenses of litigation by the dissenting opinion in *Hochschild* v. *Commissioner, supra*, at 819, but was not accepted by the majority.

But for these distinctions the two cases closely resemble each other. In both, the respective taxpayers sought to protect the present quality and quantity of their ownership against the claims of an adverse party. In both, the taxpayers expended moneys for legal assistance to aid them in accomplishing this objective and in both, the amounts were reasonable and proximately related to the purpose of conserving either business property or property held for the production of income. As mentioned earlier, the fact that deduction was granted in the *Hochschild* case under section 23 (a) (1) while deduction here is sought under section 23 (a) (2) is not a sufficient ground for distinguishing the two cases. Despite the different wording, the two statutory provisions are comparable and in pari materia.

*Allen v. Selig*, 200 F. 2d 487 (C. A. 5, 1952), is another case in which a strict construction of the title rule was obviated. There the taxpayer, a widow, brought suit to establish her joint ownership of property which was held in the legal name of her deceased husband. Litigation expenses were incurred which she sought to deduct. The court held that the costs of litigation were not for the purpose of acquiring or defending title but that title had always existed in the taxpayer and that therefore the suit was essentially conservatory.

Respondent's attempt to distinguish this case from the instant case on the basis that the taxpayer would have secured title to the property in any event is ineffectual. If the property had been included in the estate of the deceased husband the taxpayer would not have obtained the property on the strength of her own title but instead through her husband's devise so that the property would have been subject to his debts, costs of administration, possible will contest suits, and other hazards. The legal expenses were therefore for the purpose of defending or conserving her own title.

The taxpayer in *Frederick E. Rowe*, 24 T. C. 382 (1955), held a remainder interest in a trust which granted broad discretion as to allocations of receipts to corpus and to income. A dispute arose between the executors and the life tenant, and petitioner joined in the executors' action seeking to justify their allocations and have approved their final accounting. Petitioner sought to deduct her expenses under section 23 (a) (2), which deduction was disallowed by the Commissioner. In allowing the deduction, we said at page 384:

Marian paid the fee to conserve and maintain her remainder interest in the trust corpus by having left as a part thereof the income of the trust which was withheld from the life beneficiary and properly set aside as corpus in the form of reserves for depreciation and depletion of that corpus as oil or gas was removed. The vested remainder interest which Marian held in one-fourth of the trust corpus was property held by her for the production of income within the meaning of section 23 (a) (2). The regulations recognize that the prop-

erty need not produce income taxable to the petitioner in the year of the expenditure. \* \* \* We hold that the fee was paid for the conservation or maintenance, or both, of property held for the production of income within the meaning of section 23 (a) (2).

Thus, *Rowe* holds that the portion of receipts allocated to corpus had become a part of the trust corpus which was property beneficially held by petitioner for the production of income within the meaning of section 23 (a) (2) and that her expenses in defense of this property were conservatory in nature and deductible. The principles applied are applicable to the instant case.

In *Bliss* v. *Commissioner*, 57 F. 2d 984 (C. A. 5, 1932), reversing 20 B. T. A. 35, the question of expense treatment for expenses of an action in jactitation for slander of title was involved. In allowing such treatment, the court stated at page 986:

The defendants in the suits brought by the firm admitted the firm's ownership of the lands in question. \* \* \* To treat as an addition to the cost of land the amount of an expenditure made, after ownership was acquired, to enable the owner, \* \* \* to possess and use the land for business purposes, undisturbed by intruders or trespassers, would involve a disregard of the difference between the cost of *acquiring* ownership of property and expenses paid or incurred to *protect* the owner's right to undisturbed possession and enjoyment of his property, and what it yields or produces \* \* \*. It seems reasonable to treat amounts expended for services rendered in ejecting or excluding trespassers after ownership has been acquired as expenses incident to the ownership of property and the acquisition and enjoyment of income from it, rather than as additions to the capital investment in the property. [Emphasis supplied.]

In *Jones' Estate* v. *Commissioner*, 127 F. 2d 231 (C. A. 5, 1942), the court stated that *Bliss* was overruled to the extent, if any, it was in conflict with *Jones' Estate*. However, as I have already noted, the doctrine of *Bliss* has been approved and reaffirmed by the Fifth Circuit as recently as 1956 in *Campbell* v. *Fields, supra,* and the *Bliss* doctrine was also relied upon by the Court of Claims in 1955 in the case of *Brown-Forman Distillers Corp.* v. *United States, supra.*

I note here that *Jones' Estate* v. *Commissioner, supra,* involved an attack upon the perfection of petitioner's title at the time of its original acquisition in that the daughter of petitioner's vendor claimed to have received and recorded a prior deed from her father and consequently, under my view, the *Jones' Estate* and *Bliss* doctrines are not in conflict.

*Commissioner* v. *Speyer*, 77 F. 2d 824 (C. A. 2, 1935), affirming 30 B. T. A. 517 (1934), certiorari denied sub nom. *Helvering* v. *Speyer*, 296 U. S. 631 (1935), is factually very similar to the instant case. There, the taxpayer, a United States citizen, was engaged in the banking business in the United States and Germany. At the beginning of World War I he possessed large bank deposits in German banks.

Because of the conflict and the restriction placed upon the movement of enemy capital the taxpayer was unable to withdraw these deposits. After the war the administration of claims against German debtors was placed in the Mixed Claims Commission. The taxpayer incurred expenses for legal services rendered in preparing and filing claims with this Commission. In allowing the taxpayer a deduction in the amount of these expenses, the Court of Appeals for the Second Circuit stated:

The cost of the recovery of these balances through the Mixed Claims Commission comes directly within the specifications of deductions for expenses. The proceedings before the Mixed Claims Commission were for the purpose of recovering assets for the taxpayer. It is not questioned but that the attorneys were paid the amounts claimed in connection with the transaction of this business. Such fees are deductible as an expense of the business. Kornhauser v. United States, 276 U. S. 145, 48 S. Ct. 219, 72 L. Ed. 505.

We regard the reasoning of the court as applicable to the case now before us. The proceedings in settlement of petitioner's claim and civil suit were for the purposes of recovering possession of her investment property and conserving her admittedly perfect original title thereto. For petitioner to employ lawyers to defend a business owned by her from threatened destruction would be both ordinary and necessary. Cf. *Commissioner* v. *Heininger*, 320 U. S. 467; *Kornhauser* v. *United States*, 276 U. S. 145. We think the words "ordinary and necessary" should be similarly construed where petitioner employs lawyers and investigators to assist her in recovering her nontrade or nonbusiness investment property from a threatened confiscation. Petitioner's purpose in bringing suit against the Attorney General was to preserve the quality and quantity of her pre-September 23, 1948, title. It was not to obtain a new title or to perfect or add to her pre-1948 title. Petitioner's expenses were therefore conservatory rather than capital in nature.[6]

Petitioner here had held perfect title to income-producing property for an uninterrupted period of many years without challenge[7] and the attack giving rise to this litigation depended upon wholly extraneous and later circumstances and could not have been made at the time title was obtained. Under these circumstances the expenses of defending title are clearly current deductions which can in no way be regarded as increasing the value of the property.

FISHER, PIERCE, and TRAIN, *JJ.*, agree with this dissent.

---

[6] Cf. *Straub* v. *Granger*, 143 F. Supp. 250 (W. D. Pa., 1956), and *Heller* v. *Commissioner*, 147 F. 2d 376, affirming 2 T. C. 371, which cases are factually dissimilar to the instant case but allow the claimed deductions as being "conservatory" of taxpayer's title.

[7] According to her sworn statement in Exhibit 3 of the Stipulation, petitioner had owned these stocks and bonds since 1935 and earlier dates.