**BROWN–FORMAN DISTILLERS CORPORATION**

v.

**The UNITED STATES.**

No. 104–53.

United States Court of Claims.

July 12, 1955.

J. Marvin Haynes, Washington, D. C., Haynes & Miller, N. Barr Miller, F. Eberhart Haynes, Oscar L. Tyree, and Joseph H. Sheppard, Washington, D. C., on the briefs, for plaintiff.

Robert H. Weinstein, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

Plaintiff sues to recover $1,030,688.86, plus interest, which represents income and excess profits taxes and deficiency interest paid for its fiscal years ended April 30, 1943, through 1950, inclusive. There are two issues presented. The first and principal one is the reasonableness of compensation paid to plaintiff's officers and key employees in accordance with its incentive compensation plan for each of the years involved. The other issue is whether $10,000 spent in the fiscal year 1948, in expediting the closing of a street through plaintiff's property, should be allowed as an expense deduction or capitalized.

The plaintiff duly filed its returns and paid its taxes for the years here involved in the amounts set forth below.[1] The

| Fiscal year ended Apr. 30 | Total Federal taxes due |
|---|---|
| 1943 | $1,188,750.59 |
| 1944 | 1,996,237.45 |
| 1945 | 2,662,306.25 |
| 1946 | 3,247,434.56 |
| 1947 | 3,560,650.72 |
| 1948 | 3,301,096.83 |
| 1949 | 2,491,272.34 |
| 1950 | 2,097,057.59 |
| Total | 20,544,806.33 |

Commissioner of Internal Revenue disallowed part of plaintiff's deductions and assessed, and plaintiff paid, the resulting

deficiencies in tax, with interest. On January 28, 1953, plaintiff filed timely claims for refund in the amounts set forth below.[2] The Commissioner reject-

| 2 Fiscal year ended Apr. 30 | Kind of tax | Amount of tax | Amount of overpaid interest |
|---|---|---|---|
| 1943 | Declared value excess profits .... | $3,960.00 | $2,177.51 |
| | Excess profits ..................... | 44,832.00 | 22,063.07 |
| 1944 | Declared value excess profits .... | 8,052.52 | 3,970.78 |
| | Excess profits ..................... | 85,359.23 | 43,005.46 |
| 1945 | Excess profits ..................... | 111,030.90 | 45,602.72 |
| 1946 | Income .............................. | 19,874.08 | 7,448.69 |
| | Excess profits ..................... | 95,935.51 | 45,305.77 |
| 1947 | Income .............................. | 185,916.07 | 80,465.08 |
| 1948 | Income .............................. | 128,379.76 | 19,497.17 |
| 1949 | Income .............................. | 40,316.03 | 8,760.45 |
| 1950 | Income .............................. | 25,097.72 | 3,637.74 |
| Total ................................ | | 748,754.42 | 281,934.44 |
| Total of overpaid tax and interest ........... | | 1,030,688.86 | ................. |

ed the claims for refund and suit was timely instituted in this court.

The plaintiff is in the business of manufacturing, selling and distributing on a nationwide basis, distilled spirits, principally "Old Forester," "Early Times," and "King." The plaintiff is a successor to the business of an earlier Kentucky corporation which, with its predecessor, had been engaged in the same business since 1870. During prohibition it operated on a reduced scale and sold "Old Forester" for medical use under one of eight such Federal permits issued. Upon repeal of the Eighteenth Amendment, effective December 5, 1933, the Kentucky corporation was reorganized into the present Delaware corporation.

Selling whisky, which has been aged for several years, at premium prices, is plaintiff's specialty in the industry. Shortly after prohibition there was a rush by all distillers to get back into production and in the early years plaintiff, in competition with other and some much larger companies, first sold three-months-old whisky, then a six-months-old product, nine-months and then a year-old product.

By 1936 or 1937, it became apparent to plaintiff that it could not, under its existing policy and management, profitably compete on a volume basis with the larger companies and that it was failing to accumulate the necessary inventory of aged quality whisky with which to demand premium prices. Accordingly, in 1938, plaintiff dismissed its then executive vice president and appointed a management executive committee to direct its operations. This committee consisted of Owsley Brown, its president, his two sons, Lyons and Garvin, and John Sanderlin. At that time plaintiff commenced to accumulate its whisky distillations until they had matured beyond four years of age, so it would be in a position to sell quality whisky at premium prices. This policy of accumulating the distillations resulted in a weak financial position until the sale of this aged whisky. Due to this condition relatively low salaries were paid plaintiff's officers and key employees during this period.

During the latter part of 1941 and in 1942, a study was made for the purpose of evolving a plan for increased compensation for the officers and key employees. The plaintiff's attorney recommended an incentive compensation plan providing for the payment of 10 percent of net profits to the officers and key employees and he considered this plan to be in line with incentive compensation paid by other companies. A non-company and non-family director of the plaintiff, who had had experience with incentive compensation plans, supported and advocated the proposed plan.

At the July 28, 1942, meeting of the board of directors a resolution was adopted fixing salaries for its then six officers, approving an incentive compensation plan, and fixing participating percentages for the officers and eight key employees. The plan adopted by this resolution was in effect from April 30, 1943, through April 30, 1946. Thereafter, by various resolutions, it was readopted with certain revisions reducing the percentage participation of the officers and providing for percentage participation of additional employees who were not officers. The incentive compensation and fixed salaries paid for each year in controversy were pursuant to contractual arrangements made before the services were rendered.

When the incentive compensation plan was adopted, Owsley Brown and his two sons and his brother, Robinson, together with their families, owned 51 percent of plaintiff's voting stock. These four Browns were members of the board of directors, but they did not constitute a majority of the board, which consisted of nine members in each year.

The pertinent part of section 23 of the Internal Revenue Code of 1939, as amended, 26 U.S.C.A., provides:

"Deductions from gross income

"In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *."

The pertinent part of Treasury Regulations 111 is set forth below.[3]

Although the Commissioner of Internal Revenue disallowed deductions for part of the compensation of several of plaintiff's officers and key employees, the defendant now only seriously contends that the compensation of Lyons and Garvin Brown was excessive. The commissioner of this court has found that the compensation paid to the officers and key employees here in dispute was reasonable and was, under the facts and circumstances shown by the record, an ordinary and necessary business expense and therefore deductible under section 23 of the Code. In our opinion the record amply supports this finding and we are in complete agreement with it. Inasmuch as the defendant does not now seriously contest the amounts paid those officers and key employees (aside from Lyons and Garvin Brown) and there are detailed findings on those individuals, no further discussion as to the reasonableness of their compensation is deemed necessary.

W. L. Lyons Brown, a son of Owsley Brown, served as secretary of plaintiff

3. "Sec. 29.23(a)—6. *Compensation for Personal Services.*—Among the ordinary and necessary expenses paid or incurred in carrying on any trade or business may be included a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. This test and its practical application may be further stated and illustrated as follows: * * *

"(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the en-

terprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid."

from 1933 to 1939, as vice president from 1939 to 1945, and was president thereafter during the years in question. During the company's critical financial period commencing in 1938, he served on the management committee and in this capacity was responsible for adopting and carrying out plans which contributed to the phenomenal success of the company. He was born in 1906, had four years of college, and had had experience with a large brokerage firm as branch manager from 1928 to 1932. He also had experience as a cruise director in a travel business. He came with the plaintiff's predecessor in 1933, and did some construction work. He was elected director and secretary of plaintiff, and became the advertising director. He was elected vice president in 1939, and took on additional duties as sales manager for the company. The activities of regional offices in New York, Chicago, and San Francisco were under his supervision. During the period involved he was also chairman of the executive committee of the company.

As vice president he was director of the entire sales and advertising organizations. Both as vice president and president he was in charge of frequently held management conferences which formulated plaintiff's over-all business policies. under his supervision plaintiff's net sales increased from approximately $11,200,000 in 1942, to $45,700,000 in 1950. Advertising expenditures under his supervision increased from about $539,000 in 1942, to about $3,408,000 in 1950. The activities of approximately 100 to 125 men in the sales organization were under his supervision. After he became president he initiated and directed plaintiff's policies, and had general supervision of all operations. He has a reputation as one of the top executives in the distillery industry and he devotes his entire time to the affairs of the business.

George Garvin Brown, a son of Owsley Brown, served as assistant secretary and purchasing agent, production manager, vice president in charge of production, and executive vice president of plaintiff between 1933 and 1950. He also was on the management committee during the critical financial period beginning in 1938 and was responsible for adopting and carrying out policies which contributed to the success of the company. He was born in 1912, and had a college education. He also had experience as a cruise director. He started with plaintiff in 1933 as a labor foreman. He was elected to the board of directors and assistant secretary, and also served as purchasing agent in that year. In 1934, he became production manager. He was elected vice president in 1938, and executive vice president in 1945. While production manager he was in complete charge of all production, including the manufacturing, warehousing and bottling of whisky, and the procurement of supplies. During the war plaintiff was in production, under Garvin's supervision, on a 24-hour, 7-day week schedule, producing alcohol for the Government. He was also in charge of construction work and cooperage in as many as 16 mills in several states. The number of employees under his supervision in the production work was from 500 to over 1,000. He was also senior officer in charge of labor relations for the company. He participated in the formulation of plaintiff's over-all business policies and served on its executive committee. He has an excellent reputation as an executive in the distillery industry and he devoted his entire time to his employment with plaintiff.

The total annual compensation paid Garvin by plaintiff was the same as that paid Lyons, except for 1943, when Garvin received about $500 less than Lyons. The total compensation paid Lyons, in round numbers, was $49,750 for 1943; $82,700 for 1944; $100,600 for 1945; $113,800 for 1946; $160,800 for 1947; $141,700 for 1948; $118,800 for 1949; $106,700 for 1950. The amount received as incentive compensation ranged from two-thirds to three-quarters of the total amount paid for each year.

It is relevant to note that following the adoption of the incentive compensa-

tion plan plaintiff began to show a rapid growth. Net sales had increased from $11,200,000 in 1942, to $45,700,000 in 1950. Net profits before taxes, but after deducting all compensation payments, had increased from $668,000 in 1942, to $5,621,000 in 1950. Earnings on common stock had increased from 47 cents per share in 1942, to $4.64 per share in 1950. Plaintiff's stock was actively traded on the American Stock Exchange and the market value of the stock increased by about 60 times from a low of about $1.25 per share. Dividends paid in 1942 amounted to $30,000, whereas by 1950 they had increased to $981,735. Total assets for 1942 were $9,135,000 and had increased to $41,805,000 by 1950. Working capital had increased from $2,490,000 in 1942, to $25,795,000 in 1950. Employees numbering 535 in 1942 had increased to 1,038 in 1950. There were also substantial increases in plaintiff's capacity during this period.

The plaintiff made full disclosure of its compensation plan for Securities Exchange purposes, and its stockholders have never objected to the amounts paid as compensation. It should be borne in mind that the Browns and their families only owned about 51 percent of the voting stock. Also, plaintiff had outstanding indebtedness ranging from $3,884,310 to $17,200,000 and none of the creditors has raised any objection to the amount paid as compensation. Plaintiff's compensation plan met the salary stabilization requirements.

Every business, especially one as highly competitive as the business of the plaintiff is largely dependent upon the capacity, resourcefulness, and assiduity which its executive officers personally give to it, and incentive compensation is a prudent method of instilling additional enthusiasm in these leaders and is clearly recognized for tax purposes as long as the total compensation is reasonable. William S. Gray & Co. v. United States, 35 F.2d 968, 68 Ct.Cl. 480, and the cases there cited.

The factors mentioned above indicate that the officers and key employees of plaintiff were top men in their field and were entitled to compensation commensurate therewith. What is the compensation commensurate with their respective abilities and the time they devoted to the business? The board of directors thought the compensation paid was commensurate. None of the stockholders and creditors felt at any time that the compensation paid them was unreasonable. But better evidence of the reasonableness of the compensation paid is the compensation paid by other whisky businesses, comparable not only in volume of sales, but also in net profits. Also pertinent is opinion evidence, supported by facts, of qualified experts in the industry as to the reasonableness of the compensation paid.

A comparison with Glenmore Distilleries of Louisville, Kentucky, which was deemed by the defendant to be comparable, indicates that the sales were comparable and that the profits of plaintiff were higher in every year in dispute here, except for 1948. During this 8-year comparison period plaintiff's profits, after deducting all compensation, exceeded those of Glenmore's by about $14,000,000. A comparison of the compensation paid by the two companies indicates that for the earlier years in question plaintiff paid its officers almost twice as much as did Glenmore, which had a bonus plan, but for the later years the compensation of Glenmore gradually increased and in 1950 the compensation paid by Glenmore to its officers was more than that paid by plaintiff. The president of Glenmore, who was a witness for the *defendant*, stated that the compensation paid by plaintiff was reasonable and that such a plan would have been beneficial to his company.

The argument of defendant that Lyons and Garvin Brown received their high position and compensation because they were members of the Brown family and not necessarily because of their abilities or the work they performed is without support in the record. Obviously, the fact that they were Browns had some effect on their obtaining their high posi-

tions, but that is of no moment. The question is whether the compensation paid to them was reasonable in the relation of their abilities and the work which they actually performed. On this record we find that it was. The record indicates that the competence and business skill of plaintiff's officers and key employees were responsible for plaintiff's phenomenal growth, success and top standing in the industry today. Much higher compensation has been paid for lesser results. See the cases cited in William S. Gray & Co. v. United States, supra, and the cases following that decision.

■ We hold that the compensation incurred and paid by plaintiff to the officers and key employees involved in this action was reasonable and was an ordinary and necessary business expense and is deductible in full under section 23 of the Code.

The other issue in this case is whether the expenditures made by plaintiff in 1948, in connection with the closing of Howard Street, are expenses or capital expenditures. The plaintiff owned in fee both sides of the street and under Kentucky law owned the fee to the street. However, it had been permanently dedicated to the city of Louisville. The Board of Aldermen passed the necessary resolution permanently closing the street. The city attorney was then required to file suit to dispose of certain formalities. The city attorney thought that in addition to plaintiff certain other property owners should be made defendants. The plaintiff disagreed with this but in order to accomplish the immediate closing of the street it paid $7,500 to an attorney representing the several parties. Plaintiff also paid $2,000 directly to one of the landowners. A fee of $500 was required to be paid the city attorney in connection with the closing of the street.

■ The sole question is whether this $10,000, or any part thereof, was paid in "acquisition" of property or in the "protection" of property. If it was paid in the acquisition of property it should be capitalized, but if paid in the protection of an existing property right it should be deducted as an expense. Bliss v. Commissioner, 5 Cir., 57 F.2d 984, 986; Reakirt v. Commissioner, 29 B.T.A. 1296, affirmed per curiam, 6 Cir., 84 F.2d 996. Cf. Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505; Welch v. Helvering, 290 U.S. 111, 54 S. Ct. 8, 78 L.Ed. 212; Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171. On this record we are of the opinion that the sum of $10,000 paid by plaintiff in the circumstances was a deductible expense. The $500 paid the city was nothing more than a nominal fee necessary to be paid to the city as an expense incident to the closing of the street. This expenditure was incurred and paid by plaintiff as a necessary expense for the permanent protection of its property under the resolution of the Board of Aldermen of the city, closing the street.

The resolution of the Board of Aldermen gave plaintiff all the title and interest that it could obtain to this property. The payment of $9,500 by plaintiff added not one cent of value to the property. The record shows that the parties to whom the $9,500 was paid not only had no right to prevent plaintiff from retaining its right to the permanent exclusive use of the closed street, but in fact, had no right to be paid anything by reason of the street closing. By the payment of the sum of $9,500 plaintiff received nothing but time, i. e., the immediate exclusive use of the property as opposed to the time required to get all the parties before the court for the formal suit and avoid the time and trouble of litigation. The expenditure of this sum was more in the nature of a short-term expense rather than a capital expenditure that added value to plaintiff's existing property rights.

We therefore conclude that the sum of $10,000 which plaintiff paid should, under all the facts and circumstances, be deducted as an ordinary and necessary business expense.

Judgment is suspended pending the filing of a stipulation by the parties show-

ing the amount due in accordance with this opinion.

It is so ordered.

JONES, Chief Judge, and LARA-MORE, MADDEN, and WHITAKER, Judges, concur.