HENRY CARTAN AND BARBARA SESNON CARTAN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 56818, 56819, 56821. Filed May 16, 1958.

[1] Proceedings of the following petitioners are consolidated herewith: W. T. Sesnon, Jr., and Jacqueline K. Sesnon, Docket No. 56819; and Porter Sesnon and Helen Sesnon, Docket No. 56821.

*Everett S. Layman, Esq.*, and *Arthur J. Lempert, Esq.*, for the petitioners.

*Leslie T. Jones, Esq.*, for the respondent.

The respondent determined deficiencies in petitioners' income tax as follows:

| Docket No. | Petitioner | 1949 | 1950 |
|---|---|---|---|
| 56818 | Henry and Barbara Sesnon Cartan | $9,018.27 | 0 |
| 56819 | W. T., Jr., and Jacqueline K. Sesnon | 10,797.28 | $351.94 |
| 56821 | Porter and Helen F. Sesnon | 7,210.01 | 0 |

There are three issues. First, is the sum of $45,000, expended by the petitioners in the year 1949 to prevent the depletion of gas pressure and consequent reduction in the amount of oil recoverable from a producing field, an expenditure recoverable over a term of years or may it be deducted in the year expended under section 23 (a) of the Internal Revenue Code of 1939? Second, does $4,500 (10 per cent of $45,000) represent the nondepreciable cost of an interest in minerals? Third, are certain travel and entertainment expenses claimed in Docket No. 56819 deductible expenditures?

Another issue in Docket No. 56819 concerning the deductibility of a bad debt was settled prior to trial.

### FINDINGS OF FACT.

Most of the facts are stipulated, the stipulations being incorporated herein by this reference.

Henry Cartan and Barbara Sesnon Cartan are husband and wife, computing their income on the cash basis of accounting. They reside in San Francisco, California, and filed joint income tax returns for the years 1949 and following with the collector of internal revenue at San Francisco.

W. T. Sesnon, Jr., and Jacqueline K. Sesnon are husband and wife, computing their income on the cash basis of accounting. They reside in Beverly Hills, California, and filed joint income tax returns for the years 1949 and following with the collector of internal revenue at Los Angeles.

Porter Sesnon and Helen Sesnon are husband and wife, computing their income on the cash basis of accounting. They reside in San Francisco, California, and filed joint income tax returns for the years 1949 and following with the collector of internal revenue at San Francisco.

Porter Sesnon, W. T. Sesnon, Jr., and Barbara Sesnon Cartan are brothers and sister and, for convenience, are hereinafter referred to as petitioners.

The Aliso Canyon Oil Field in the county of Los Angeles contains a productive area known as the Sesnon Zone. This zone contains a reservoir of gas and oil in solution, herein usually called the "oil belt," pressure-connected with a reservoir of gas therein usually called the "gas cap." Pressure exerted by the gas cap on the oil belt is the dominant oil recovery mechanism in the Sesnon Zone but pressure of gas in solution is also used to drive the oil to the well bore. Production of gas from the gas cap or production of excessive quantities of gas (either of gas escaping from solution in oil or of gas-cap gas), in relation to the oil recovered from such production, would wastefully decrease the reservoir pressure in the Sesnon Zone, resulting in leaving millions of barrels of oil in place, unrecovered and unrecoverable under any presently known commercial method.

In 1949 it was estimated by engineers of the petitioners and other oil producers that 1,150 surface acres overlay the Sesnon Zone. Approximately 800 of these acres were owned in 1949 by the petitioners as tenants in common, Porter Sesnon, W. T. Sesnon, Jr., and Barbara Sesnon Cartan each owning an undivided third. Some of the lands owned by the petitioners were under lease to Tide Water Associated Oil Company (hereinafter referred to as Tide Water) in 1949, and some were under lease to Standard Oil Company of California (hereinafter referred to as Standard).

A small portion of the surface acreage overlying or in 1949 believed to overlie the Sesnon Zone was owned by Jane Cato Marquis and Lewis F. Marquis. This portion is hereinafter usually referred to as the Marquis property.

In 1949, in order to prevent waste by reason of production at excessive gas-oil ratios from wells drilled on the Marquis property, and loss of reservoir pressure by reason of wells on the Marquis property producing excessive quantities of gas in relation to the oil produced therefrom, i. e., at excessive gas-oil ratios, and the consequent loss of recoverable oil, Standard and Tide Water, together with the petitioners, entered into negotiations with the owners of the Marquis property. It was proposed by the petitioners that to prevent waste in the Sesnon Zone, Standard and Tide Water should lease or otherwise acquire the Marquis property and thus make it impossible for any outside parties to drill into the Sesnon Zone from the Marquis lands.

Standard and Tide Water at the outset refused to consummate the proposed lease unless petitioners would pay 15 per cent of the annual rental, which the petitioners declined to do. The petitioners countered with a proposal that each of the three petitioners would pay a lump sum of $15,000 or a total sum of $45,000, which was 15 per cent of $300,000, the aggregate of the rental for the first 20 years. The petitioners were willing to do this only in order to facilitate the transaction

and thus conserve their properties and prevent any loss of income to them due to possible wasteful operation of the Marquis property.

On November 14, 1949, Tide Water and Standard executed a lease for the Marquis property with Jane Cato Marquis and Lewis F. Marquis. This lease commenced on January 1, 1950, and extended for 40 years, but lessees were entitled to quitclaim the lease after December 31, 1969. Rent was payable by annual installments of $15,000. Petitioners were referred to in the lease as "neighboring producers."

The lease provided that the oil companies might obtain from the neighboring producers a contribution to the annual rent due the lessors. Provisions of the lease made it unnecessary for the lessees to develop the leased property or utilize it for any purpose. The lease recognized that hydrocarbons were being extracted from lands owned by the lessees and the neighboring producers and that this might or would drain oil and gas from the leased premises. The lessees and the neighboring producers were released from liability for such detrimental results to the leased property. The lessor was entitled to royalties on oil, gas, and gasoline extracted or produced from the leased property. Royalties were payable only when the amount exceeded the annual rent. The terms of the lease inured to the benefit of the neighboring producers.

On or before November 14, 1949, Standard and Tide Water, as first parties, and petitioners, as second parties, executed an agreement providing in part as follows:

WHEREAS, a certain instrument entitled LEASE AND AGREEMENT and herein sometimes referred to as "lease and agreement" of even date herewith, is about to be executed between JANE CATO MARQUIS and LEWIS F. MARQUIS, her husband, as Lessor, and First Party herein as Lessee, relating to certain property therein described in the City of Los Angeles, County of Los Angeles, State of California, in which lease and agreement Second Party is named as among the "neighboring producers" and as one of the owners of lands in the general area of the lands leased under said lease and agreement; and

WHEREAS, the said lease and agreement further provides that the said Lessee therein may obtain from said neighboring producers or from some or all of them or from others a sum or sums, either as a consideration for the execution of said lease and agreement by said Lessee or as a payment on account of or a contribution to the Fifteen Thousand Dollars ($15,000.00) annual rental payable thereunder by the said Lessee to the said Lessor; and

WHEREAS, Second Party herein desires to deposit with Tide Water Associated Oil Company the sum of Forty-five Thousand Dollars ($45,000.00) with which the latter shall make payments as hereinafter provided;

Now, THEREFORE, in consideration of the premises and of the agreements hereinafter contained, the parties hereto agree as follows:

\*     \*     \*     \*     \*     \*     \*

*Article 2.* It is understood and agreed that this agreement shall become effective only if and when said lease and agreement is executed; and that if for any reason said lease and agreement is not executed, this agreement shall be wholly void.

*Article 3.* Immediately upon execution of this agreement and of said lease and agreement, Second Party agrees to deposit with Tide Water Associated Oil Company the sum of Forty-five Thousand Dollars ($45,000) for the purposes and subject to the provisions of this Article 3.

On or before the 31st day of March, 1950, and on or before the 31st day of March of each calendar year thereafter up to and including March 31, 1969, or for such portion of such period as said lease and agreement is in effect, said Tide Water Associated Oil Company shall withdraw from said deposit the sum of Twenty-Two Hundred and Fifty Dollars ($2,250) and, subject to the right to defer disbursal thereof to permit compliance with Article 24 of said lease and agreement without risk to Tide Water Associated Oil Company, shall disburse the same as follows:

A. To the Lessor or to the depositary for Lessor provided for in said lease and agreement, Tide Water Associated Oil Company shall pay a sum equal to

(1) Fifteen per cent (15%) of the annual rental due Lessor under said lease and agreement for the calendar year in which such withdrawal from said deposit is made (which annual rental shall be the sum of Fifteen Thousand Dollars ($15,000) or such lesser sum to which such rental has been reduced in accordance with the provisions of Article 24 of said lease and agreement) ; minus

(2) Such sum, not in excess of fifteen per cent (15%) of the annual rental as aforesaid due Lessor under said lease and agreement for said calendar year, as shall equal fifteen per cent (15%) of the amount, if any, which but for the provisions of Article 24 and/or the first sentence of Article 10 of said lease and agreement would have been payable to the Lessor pursuant to the provisions of Articles 7, 8 and 9 thereof for production during the preceding calendar year.

B. To Second Party hereunder, Tide Water Associated Oil Company shall pay the balance, if any, of said Twenty-Two Hundred and Fifty Dollars ($2,250.00).

Following the March 31, 1969 withdrawal, or upon the sooner termination of the obligation of First Party to pay said annual rental, any balance on hand shall be paid promptly without interest by Tide Water Associated Oil Company to Second Party.

\* \* \* \* \* \* \*

*Article 4.* Save and excepting for the releases expressly made under said lease and agreement by Lessor therein to Second Party and successors, it is agreed that Second Party has no rights, claims or interest in, to or under said lease and agreement. Second Party shall have no obligation, responsibilities or liabilities thereunder of any kind or nature whatsoever.

As between the parties hereto, it is understood and agreed that First Party hereto, as Lessee in said lease and agreement, is the sole judge as to what, if any, operations Lessee will conduct under said lease and agreement, and as to the nature, extent and duration of such operation; provided, however, that if at any time during the continuance of said lease and agreement oil or gas is found in any well or wells drilled by First Party on land subject thereto, First Party, if, whenever and so long as, it operates such well or wells and produces oil or gas therefrom, shall conduct such operations in accordance with good oil field practice and at rates not substantially greater, proportionate to potential production and with due allowance for any substantial difference in conditions between the properties involved, than the rates of production by said Tide Water Associated Oil Company and said Standard Oil Company of

California on the producing properties in the same field now held by them respectively under leases from Second Party.

The petitioners, concurrently with the execution of the agreement and in the calendar year 1949, paid to Tide Water as a deposit the sum of $45,000 in accordance with the terms of the agreement. Of this $45,000 Porter Sesnon paid $15,000, W. T. Sesnon, Jr., paid $15,000, and Barbara Sesnon Cartan paid $15,000. These payments, aggregating $45,000, were made in order to prevent impairment of income-producing property owned by the petitioners.

In each of the joint returns filed by petitioners for the year 1949 each petitioner claimed a deduction for the payment of $15,000 as an ordinary and necessary expense incurred for the conservation or protection of income-producing property.

At the time of the hearing no payments had been made to the petitioners, or any one of them, pursuant to article 3 of their agreement with Tide Water and Standard.

### Facts Applicable to Docket No. 56819 Only.

The business activities of petitioner W. T. Sesnon, Jr. (hereinafter referred to as Sesnon), included real estate as well as oil interests.

For many years Sesnon was head of the Los Angeles chapter of the Red Cross and a member of the National Board of Governors of the American Red Cross. The fulfillment of these offices required him to make at least four trips a year to Chicago.

Sesnon, during the years 1949 and 1950, was a member of the following clubs to which he paid the amounts indicated:

| 1949 Club | Dues | Other payments | Total |
|---|---|---|---|
| Beverly Hills Club | (1) | (1) | $505.02 |
| Bohemian Club | $108.00 | $89.41 | 197.41 |
| California Club | 288.00 | 585.04 | 873.04 |
| Chicago Club | (1) | (1) | 319.20 |
| Los Angeles Country Club | 324.80 | 36.48 | 361.28 |
| Pacific Union Club | 2 316.80 | 21.36 | 338.16 |
| Total payments to all clubs | | | 2,594.11 |
| 1950 | | | |
| Beverly Hills Club | (1) | (1) | $528.90 |
| Bohemian Club | $108.00 | $528.01 | 636.01 |
| California Club | 288.00 | 497.14 | 785.14 |
| Chicago Club | (1) | (1) | 238.04 |
| Los Angeles Country Club | 331.20 | 208.17 | 539.37 |
| Pacific Union Club | 2 316.80 | 94.79 | 411.59 |
| Total payments to all clubs | | | 3,139.05 |

1 Not sufficient information to segregate.
2 At least.

The Beverly Hills Club is a restaurant club in Beverly Hills, near Sesnon's home. During 1949 and 1950 Sesnon used the club for social purposes, as well as to entertain his attorney, and engineers and geologists with whom he discussed business affairs.

The Bohemian Club is located in San Francisco. The club also has an establishment called Bohemian Grove. During 1949 and 1950 Sesnon used these facilities when he was in San Francisco solely to entertain people in related business activities, primarily the oil business. These guests included engineers and geologists.

Sesnon joined the California Club in Los Angeles because his business associates congregated there almost daily. He took no social guests to the club but entertained there only persons who were associated with his business activities.

Sesnon joined the Chicago Club primarily because his Red Cross activities required him to make at least four trips a year to that city. He needed a place in which to stay when in Chicago and to entertain such people as he met there for other business reasons. He made no social use of the club. He was reimbursed by the Red Cross for rail and airline tickets but did not apply for any incidental expenses.

Upon recommendation of the president of an oil company, Sesnon joined the Los Angeles Country Club. His primary purpose was association with people in allied businesses of which there were many in this particular club. He never played golf at that or any other club. He had a large social party at the country club during 1949 or 1950. The cost of this party was not included in the above list of expenses.

The Pacific Union Club is located in San Francisco. Sesnon used its facilities in 1949 and 1950 for the same purposes as the Bohemian Club—the entertainment of business associates when he was in San Francisco.

Some of the expenditures to the clubs were made for the economic benefit of the entire Sesnon family, and Sesnon was reimbursed a proportionate share by his brother and sister for expenditures made in line with their joint activities.

In November 1949 Sesnon made the following unreimbursed expenditures in connection with activities carried on in his office:

| | |
|---|---|
| Telephone and telegraph | $91.51 |
| Entertainment | 40.00 |
| Total unreimbursed expenditures | 131.51 |

During 1950 Sesnon drew checks in the amounts, on the dates, and to the persons indicated as follows:

| Date | Drawn to— | Amount |
|---|---|---|
| June 21 | Porter Sesnon | $150.00 |
| December 6 | Adelson Brothers | 111.79 |
| December 18 | Porter Sesnon | 29.52 |
| December 22 | H. K. Williamson | 100.00 |
| December 27 | United Vulcanizing Co | 237.61 |
| December 27 | W. D. Crandall | 40.67 |
| December 22 | Cash | 250.00 |
| Total | | 919.59 |

The $150 payment on June 21 was to reimburse Porter Sesnon for paying a guest card fee at the Bohemian Grove. The guest was brought from the East in connection with activities in the operation of their business.

The check drawn to Adelson Brothers on December 6 represented a gift of a bottle of liquor to each member of the drilling crew in the Aliso Canyon oil field. This was not an uncommon gesture in the oil business and tended to secure the cooperation of the drilling crews.

The $100 check drawn on December 22 was a gift to H. K. Williamson, an associate in the real estate business.

The payment of $237.61 to United Vulcanizing Company was for tires on a car utilized in Sesnon's business.

The $250 item on December 22 was a cash withdrawal covering expenses of a trip to San Francisco, during which Sesnon spent most of his time discussing his various operations in different parts of the country with his brother, sister, attorney, and other people.

The above checks totaling $919.59 were charged to the "Travel and Misc. Exp." account in Sesnon's general ledger for 1950. By a closing entry in Sesnon's general ledger dated December 31, 1950, the sum of $118.11 was subtracted from this account and charged to the "Cleaning oil and other Engineering Exp." account of the general ledger. No identification was made of the items of $40.67 and $29.52.

On his Federal income tax returns Sesnon claimed $2,821.36 in 1949 and $3,421.48 in 1950 for travel and entertainment expenses. On brief these amounts were reduced to $2,158.35 and $3,328.42, respectively.

Sesnon's travel and entertainment expenses for the years 1949 and 1950 are deductible in part.

OPINION.

VAN FOSSAN, *Judge:* The primary issue is whether the sum of $15,000 expended by each of the three petitioners to prevent the wasteful depletion of gas pressure and consequent reduction in the amount of oil recoverable from a producing field is deductible in the year 1949 or must be prorated over a term of years.

Petitioners entered into a contractual agreement with Tide Water Associated Oil Company and Standard Oil Company of California on November 14, 1949. This agreement recited the fact that Tide Water and Standard were about to enter into a lease with Jane Cato Marquis and Lewis F. Marquis, neighboring landowners. The agreement was to become effective only when the lease between Tide Water, Standard, and the Marquises was executed. The lease was executed on the same day—November 14, 1949.

Pursuant to their agreement with Tide Water and Standard, petitioners deposited $45,000 with Tide Water. The contract refers to the item as a deposit. Tide Water was to withdraw $2,250 from this deposit each year to pay 15 per cent of the annual rent of the Marquis lease for a period of 20 years.

The cumulative result of these arrangements was that petitioners secured protection for at least 20 years against the wasteful operation of oil or gas wells on the Marquis property. The petitioners were anxious to achieve this goal because it was thought that a portion of the gas cap of the Sesnon field extended underneath the Marquis property. If this gas cap were wastefully depleted, the pressure necessary to drive oil to well bores on the petitioners' property might be exhausted to such an extent that large quantities of oil lying beneath petitioners' property would be unrecoverable.

Petitioners contend that the deposit of $45,000 with Tide Water was an ordinary and necessary expense for the conservation of property held for production of income and thus was deductible in 1949 under the provisions of section 23 (a) (2) of the Internal Revenue Code of 1939.[2] All petitioners kept their accounts on the cash basis.

The parties have agreed that the deposit was an ordinary and necessary expense and deductible as such, the only disagreement being as to the time of deduction. We have little difficulty in determining that its intended purpose was to conserve and protect petitioners' property. However, not every expenditure which may be so characterized results in a deduction in the year of payment. In our opinion the present item is of such a nature that income will best be reflected if the deposit is deducted over a period of years.

Petitioners, by contractual agreement, acquired the benefit of an arrangement whereby the wasteful depletion of the gas pressure necessary to extract oil from their lands was prevented for at least 20 years. It does not matter that petitioners might eventually have achieved the same result through litigation. The fact is that they chose to achieve their ends by contract.

The contract provides *inter alia* that petitioners agreed to deposit $45,000 with Tide Water. From this deposit Tide Water was annually to withdraw $2,250 to make payment of 15 per cent of the rental due under the terms of the lease between Tide Water and Standard and the Marquises.

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

* * * * * *

(2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

There was no intention that the money all be expended in the year of payment. It was to be held by Tide Water and paid out in annual installments over a 20-year period.

If petitioners had each year paid $2,250 to conserve and protect their property, there is no question that the sums would have been deductible only in the years actually paid.[3] Petitioners may not, by depositing with Tide Water an amount equal to the total of these payments for 20 years, claim a deduction for all 20 years in the year of deposit.

Petitioners are party to a contract the essence of which is to award them a benefit over a period of years. Normally the payments under the contract should be deducted over those years. *Stewart Title Guaranty Co.*, 20 T. C. 630 (1953).

If, as an alternative, petitioners' deposit is considered as an advance payment of rent, the result is the same.

To prevent waste in the Sesnon Zone it was proposed by the petitioners that Standard and Tide Water lease or otherwise acquire the Marquis property and thus make it impossible for any outside parties to drill into the zone from the Marquis lands. Standard and Tide Water at the outset refused to consummate the proposed lease unless petitioners would pay 15 per cent of the annual rental, which petitioners declined to do.

The petitioners countered with a proposal that each of the petitioners pay a lump sum of $15,000, a total of $45,000, which was 15 per cent of $300,000, the aggregate of the rental for the first 20 years. This proposal was reduced to a written agreement.

As noted above, by the terms of the agreement Tide Water was each year to withdraw $2,250 from the $45,000 deposit to pay 15 per cent of the annual lease rental. If the annual rental was reduced in accord with provisions contained in the lease a proportional repayment was to be made to petitioners; similarly, if any balance remained in the deposit at the time the lease was terminated it was to be repaid to petitioners without interest.

Clearly, it may reasonably be argued that petitioners intended that their deposit of $45,000 should constitute an advance payment of the share of the rental which Tide Water and Standard demanded they contribute.

It has long been held that such advance payments may not be deducted as a business expense in the year paid but must be apportioned as an expense over the entire term of the lease. *Baton Coal Co.* v. *Commissioner*, 51 F. 2d 469 (C. A. 3, 1931); *Galatoire Bros.* v. *Lines*, 23 F. 2d 676 (C. A. 5, 1928).

---

[3] Sec. 23 (a) (2), *supra,* footnote 2.

Although petitioners were not parties to the lease, they were referred to in its provisions, they benefited by its accomplishment, and it recognized the right of the oil companies to obtain contributions to the leasehold rental from petitioners.

After considering all the evidence and arguments, we are convinced that whether we view petitioners' deposit as an allocable nonbusiness expense under section 23 (a) (2) or advance payment of rent, or otherwise characterize it, it must be regarded as an expenditure which is directly apportionable to the years in which the lease is in effect, and income will best be reflected if deductions for the expenditure are allocated over these years.

The lease commenced January 1, 1950. It was subject to quitclaim at the end of 20 years. It follows that the sum of $45,000 expended by petitioners to secure the benefits of the lease should be deducted over the fixed 20-year period beginning January 1, 1950. Cf. *Sigmund Spitzer*, 23 B. T. A. 776 (1931).

Petitioners cite several cases in which ordinary and necessary expenses incurred for the conservation of income-producing property were declared deductible in the year paid. *Alleghany Corporation*, 28 T. C. 298 (1957); *Ramsey* v. *White*, an unreported case, 56-1 U. S. T. C. 9190, 51 A. F. T. R. 1762 (S. D. Ill., 1955); *Brown-Forman Distillers Corp.* v. *United States*, 132 F. Supp. 711 (Ct. Cl., 1955); *L. B. Reakirt*, 29 B. T. A. 1296 (1934), affd. 84 F. 2d 996 (C. A. 6, 1936); and *Bliss* v. *Commissioner*, 57 F. 2d 984 (C. A. 5, 1932), overruled by *Jones' Estate* v. *Commissioner*, 127 F. 2d 231 (C. A. 5, 1942). All of these cases primarily involve costs of litigation and related expenses and thus may be distinguished on the facts.

We cannot, however, sustain respondent's contention that $4,500 (10 per cent of the sum deposited with Tide Water) should be regarded as representing petitioners' interest in oil which might be produced from the Marquis property and is thus subject to depletion rather than deductible as expense.[4]

---

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

* * * * * * *

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. In the case of property held by one person for life with remainder to another person, the deduction shall be computed as if the life tenant were the absolute owner of the property and shall be allowed to the life tenant. In the case of property held in trust the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the absence of such provisions, on the basis of the trust income allocable to each.

At the time petitioners signed the agreement with Tide Water and Standard it was theoretically possible that petitioners might recoup their entire $45,000 expenditure if Tide Water and Standard immediately developed and operated wells on the Marquis property and by royalty payments reduced or eliminated rental due the Marquises.

This provision for reimbursement must be regarded as ancillary to the main purpose of the contract which was the prevention of the depletion of the gas cap providing pressure for the operation of wells on petitioners' property. Merely because petitioners may be reimbursed for their expenditure at a future date is not cause to deny the allocation of the entire consideration over the life of the contract. Cf. *Alleghany Corporation, supra,* and *Burnet* v. *Hutchinson Coal Co.,* 64 F. 2d 275 (C. A. 4, 1933).

At the time of this hearing no such reimbursements had been made to the petitioners. If reimbursements are made in the future they may be appropriately treated at that time.

We hold that one-twentieth of the total deposit of $45,000 should be deducted in each taxable year, beginning January 1, 1950.

The last issue is whether certain "travel and entertainment expenses" incurred by W. T. Sesnon, Jr., are deductible.

Sesnon asserts that the sum of $2,158.35 expended in 1949 and the sum of $3,288.42 expended in 1950 are deductible for the respective years under section 23 (a) as ordinary and necessary expenses incurred in carrying on a business,[5] or as ordinary and necessary expenses incurred in the management of property held for the production of income.[6]

Sesnon further asserts that if the sums of $319.20 and $238.04 paid to the Chicago Club in the years 1949 and 1950, respectively, are not deductible under section 23 (a), they are, in the alternative, deductible as charitable contributions under section 23 (o).[7]

---

[5] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered ; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business ; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

[6] Sec. 23 (a) (2), *supra,* footnote 2.

[7] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

(o) CHARITABLE AND OTHER CONTRIBUTIONS.—In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of :

\* \* \* \* \* \* \*

(2) A corporation, trust, or community chest, fund, or foundation, created or organized in the United States or in any possession thereof or under the law of the United States or of any State or Territory or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation ;

Sesnon's business activities included both oil and real estate interests.

During 1949 and 1950 he was a member of several clubs variously located in Los Angeles, Beverly Hills, San Francisco, and Chicago. A schedule of his expenditures at each of these clubs for the years in question is set forth in the facts.

Entertainment expenses may be deducted from gross income only insofar as they are ordinary and necessary in carrying on a trade or business. Sec. 23 (a) (1) (A).[8] Whether or not a particular expenditure is a business expense turns on the facts of the case and the burden of proof is on the petitioner to show that such expenditures were primarily business rather than personal expenses.

Club dues may be deductible if certain tests are satisfied. Deductibility depends upon the use made of the club during each taxable year.

The Bohemian Club and the Pacific Union Club are in San Francisco. These clubs were used by Sesnon to entertain business associates, including engineers and geologists. Sesnon testified that since he did not reside in San Francisco he had no opportunity to use the clubs for social purposes during the years in question. In the usual situation the cost of the taxpayer's own meals and personal entertainment is not deductible. *Richard A. Sutter*, 21 T. C. 170 (1953). However, expenditures for board and lodging while away from home in the pursuit of a trade or business may be deducted.[9] Sesnon is therefore entitled to a deduction for his own meals while he was in San Francisco, as well as those of his business guests. All of the expenses incurred by Sesnon at the two clubs in San Francisco during the years 1949 and 1950, including dues, are deductible. *Charles S. Guggenheimer*, 18 T. C. 81 (1952).

The Los Angeles Country Club and the California Club are in Los Angeles. The Beverly Hills Club is located in Beverly Hills.

Sesnon joined the Los Angeles Country Club upon recommendation of the president of an oil company primarily for the purpose of associating with people in allied businesses. He never played golf at that or any other club. The cost of a large social party held at the country club in 1949 or 1950 was excluded from the claimed list of disbursements. To the best of Sesnon's recollection, none of the items included in the list of disbursements was spent in the entertainment of purely social guests.

This being a local club, and because of the lack of positive proof by petitioner of his personal expenses, one-half only of the payments is allowed. *Richard A. Sutter, supra.*

---

[8] Footnote 5, *supra.*

[9] Sec. 23 (a) (1). (A), *supra,* footnote 5.

Sesnon joined the California Club because his business associates congregated there almost daily. He testified that he took no social guests to the club but entertained people there who were associated with his business activities.

We are convinced that Sesnon originally joined the club solely for business reasons. However, since petitioner's personal expenses in his use of the club are not segregated or proved, one-half only of the payments to the club is allowed as a deduction. *Richard A. Sutter, supra.*

The Beverly Hills Club was near Sesnon's home and was used for social as well as business purposes. Sesnon testified that more than one-half of his entertaining there was for business reasons. As stated above, generally a taxpayer is not entitled to a deduction for amounts spent in a local club on meals and entertainment for himself or his dependents. *Richard A. Sutter, supra.* The amount paid to the Beverly Hills Club as dues is not in evidence. However, being convinced that part of the petitioner's use of the club was for purely business reasons, a deduction of $100 for each of the years 1949 and 1950 is allowed. *Cohan v. Commissioner*, 39 F. 2d 540 (C. A. 2, 1930).

For many years, fulfillment of his obligations as a member of the National Board of Governors of the American Red Cross required Sesnon to make at least four trips a year to Chicago.

Sesnon urges that amounts paid to the Chicago Club are deductible as entertainment expenses or, because of his Red Cross activities, as charitable contributions. The National Red Cross reimbursed Sesnon for railroad and airplane tickets. He testified that his duties with the Red Cross were the primary reason for joining the club. He further testified that he joined because he needed a place to stay and entertain such people as he met for business purposes. No proof was offered as to what connection these people in Chicago might have with his business. No segregation of dues paid was made. In the state of the record no deduction for business entertainment expenses or dues is allowable as such.

Respondent, however, ruled in 1955 that—

a taxpayer who gives his services gratuitously to an association, contributions to which are deductible under the provisions of section 23 (o) of the Code, and who incurs unreimbursed traveling expenses, including the cost of meals and lodging, while away from home in connection with the affairs of the association and at its direction, may deduct the amount of such unreimbursed expenses in computing his net income subject to the limitation provided by section 23 (o) of the Code. [Rev. Rul. 55–4, 1955–1 C. B. 291, 292.]

It is conceded that contributions to the American National Red Cross are deductible under section 23 (o).

We hold that a portion of Sesnon's expenditures at the Chicago Club in each of the years 1949 and 1950 may be deducted as a chari-

table contribution under section 23 (o). However, since it is impossible on the record to make a precise determination, we hold 50 per cent of the payments he made to the Chicago Club in 1949 and 1950 to be deductible in the respective years. *Cohan* v. *Commissioner*, *supra.*

In November 1949 Sesnon made unreimbursed expenditures totaling $131.51 in connection with activities carried on in his office. No explanation of these expenditures was made; they are therefore disallowed.

In 1950 Sesnon charged seven checks totaling $919.59 to the "Travel and Misc. Exp." account in his general ledger. Of this total the two following items are deductible in full: $150 to reimburse Porter Sesnon for paying a business guest's expenses at Bohemian Grove and $111.79 representing a gift of a bottle of liquor to each member of a drilling crew in the Aliso Canyon oil field. Because of the lack of proof or segregation as to the specific use of the sum of $250 claimed to cover a business trip to San Francisco to confer with the members of his family, only one-half of the sum is allowed. Two hundred thirty-seven dollars and sixty-one cents was expended for tires for a car utilized in Sesnon's business. We are not informed whether the car was used exclusively for business purposes or partly for personal ends. Accordingly, we hold only one-half of this expenditure is deductible. *Cohan* v. *Commissioner*, *supra.* Items of $29.52 and $40.67 were unexplained and are therefore disallowed. Sesnon failed to show how or why a gift of $100 to H. K. Williamson was of assistance to him in his business undertakings. The amount is disallowed.

It is stipulated that by means of a closing entry in Sesnon's general journal dated December 31, 1950, the sum of $118.11 was subtracted from the "Travel and Misc. Exp." account and charged to another account. Since we are not told to which of the items in the account this reduction applies, it will be charged against the total of the items allowed as deductions.

*Decisions will be entered under Rule 50.*