Estate of James E. Bryan, Deceased, First Citizens Bank and Trust Company, Executor, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Estate of Mary Z. Bryan, Deceased, Byron E. Bryan, Executor, Petitioner[*] *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 67236, 67237. Filed June 16, 1960.

*Stanley Worth, Esq.*, and *Edward S. Smith, Esq.*, for the petitioners.

*Richard C. Forman, Esq.*, for the respondent.

Pierce, *Judge:* The respondent determined deficiencies in the petitioners' income taxes, and also additions to tax, as follows:

| Docket No. | Year | Deficiency | Additions to tax | |
| | | | Sec. 294(d)(1)(B) | Sec. 294(d)(2) |
| --- | --- | --- | --- | --- |
| 67236 | Period 2/5/53 to 1/31/54 | $12,079.87 | | |
| 67237 | 1954 | 6,791.99 | $12.50 | $394.30 |

[*] Mary Z. Bryan died on July 9, 1957, after her petition had been filed, and prior to the trial. Accordingly, the Estate of Mary Z. Bryan, Deceased, Byron E. Bryan, Executor, was substituted as the petitioner in Docket No. 67237, and the caption of this proceeding was changed to reflect the substitution.

The cases were consolidated for trial.

The sole issue for decision is whether or not the petitioners are entitled to treat 12 geographically separate rock, sand, and gravel quarries as a single property for the purpose of computing the allowable percentage depletion deduction of a partnership of which the decedents had been members.

The petitioners have conceded that they are liable for the addition to tax under section 294(d)(1)(B) in the amount of $12.50; and that the addition to tax under section 294(d)(2) depends upon the outcome of the depletion issue. All other issues raised by the pleadings were settled by stipulation of the parties.

## FINDINGS OF FACT.

Some of the facts have been stipulated; and the stipulation, with the exhibits attached thereto, is incorporated herein by reference.

Prior to February 5, 1953, James E. and Mary Z. Bryan were husband and wife, with residence in Raleigh, North Carolina. On the above date, James died; and about 4 years thereafter, on July 9, 1957, Mary also died. The Federal fiduciary income tax return of the Estate of James E. Bryan for the period from February 5, 1953, to January 31, 1954, and also the Federal income tax return of Mary Z. Bryan for the calendar year 1954, were filed with the district director of internal revenue at Greensboro, North Carolina.

At the time of James' death, he and Mary were the members of a general partnership known as Bryan Rock & Sand Company, which was engaged in the operation of several sand, gravel, and rock quarries. Following James' death, a limited partnership of the same name was formed to take over the business. In this, Mary was the sole general partner, and the corporate executor of the estate of James was the sole limited partner; and they, as such, equally shared the limited partnership's profits and losses.

During such limited partnership's fiscal year ended January 31, 1954, which is here involved, such partnership either owned or had an interest in 12 separate sand, gravel, and rock quarries, located in 8 different counties in North Carolina and in 1 county in Virginia, as follows:

| Property | County | Mineral |
| --- | --- | --- |
| Margarettsville | Northampton | Sand and gravel. |
| Garysburg | Northampton | Sand and gravel. |
| Rolesville | Wake | Granite crushed stone. |
| Goldsboro | Wayne | Sand deposits. |
| Puddledock | Prince George, Va | Sand and gravel. |
| Aberdeen | Moore and Hoke | Sand deposits. |
| Linden | Cumberland | Sand and gravel. |
| West End | Moore | Sand and gravel. |
| Rockton | Wake | Granite crushed stone. |
| Neverson | Wilson | Granite crushed stone. |
| Greystone | Vance | Granite crushed stone. |
| Crabtree Creek | Wake | Granite crushed stone. |

The several quarries were not contiguous to one another, but were separated by distances up to 225 miles. Crabtree Creek was not owned by the limited partnership, but was leased from others. All the other quarries had been acquired prior to 1948 by various predecessors of the limited partnership, with the exception of Linden and Puddledock, which were acquired in 1948 and 1951, respectively. All the quarries were available for mining operations by the limited partnership during its fiscal year ending January 31, 1954, with the exception of Greystone which was leased to others and from which all the income was in the form of royalties. There were no mining operations at either Margarettsville or Rockton.

The total sales and direct costs incurred at each of the 12 abovementioned quarries (after making certain adjustments) were as follows:

| | Sales by items | Total sales | Direct costs |
|---|---|---|---|
| Garysburg gravel | $238,877.11 | | |
| Garysburg sand | 42,021.31 | $280,898.42 | |
| Garysburg operating | | | $243,104.90 |
| Rolesville stone | 1,097,588.23 | | |
| Rolesville screenings | 63,673.15 | 1,161,261.38 | |
| Rolesville operating | | | 864,773.43 |
| Goldsboro sand | 50,994.34 | 50,994.34 | |
| Goldsboro operating | | | 37,353.68 |
| Puddledock gravel | 195,757.62 | | |
| Puddledock sand | 110,686.70 | 306,444.32 | |
| Puddledock operating | | | 238,890.21 |
| Aberdeen sand | 37,271.77 | 37,271.77 | |
| Aberdeen operating | | | 29,019.16 |
| Linden gravel | 32,114.99 | | |
| Linden sand | 110,710.05 | 142,825.04 | |
| Linden operating | | | 74,521.68 |
| West End sand | 21,725.32 | 21,725.32 | |
| West End operating | | | 22,282.70 |
| Crabtree Creek stone | 156,696.76 | 156,696.76 | |
| Crabtree Creek operating | | | 177,630.49 |
| Rockton expense | | | [1] 2,643.89 |
| Neverson stone | 1,456,938.26 | | |
| Neverson screenings | 85,835.33 | 1,542,773.59 | |
| Neverson operating | | | 1,073,702.05 |
| Greystone royalties | 109,955.08 | 109,955.08 | |
| Greystone expense | | | 100.00 |
| Margarettsville sales | 1,641.50 | [2] 1,641.50 | |
| Total | | 3,812,487.52 | 2,764,022.19 |

[1] Represents maintenance expenses.
[2] Represents sales from stock of previously quarried material.

Insofar as practical, the 12 separate quarries were operated by the limited partnership as a single unit. All the books and records of the same were maintained in a central office in Raleigh, North Carolina, from which the overall business operations of such partnership were conducted. Information for all tax returns (State, ad valorem and Federal) was maintained in the central office. Equipment and personnel were moved whenever necessary between the various quarries; but no records of these movements were kept. At the Rolesville and Puddledock quarries, the limited partnership maintained its principal equipment repair shops, at which most major repairs were handled; but in some instances, the machinery to be repaired was

so large and heavy that a repair crew would be dispatched from one of these two principal repair shops to the quarry where the particular piece of machinery was located. In every instance, however, the cost of the major repairs was charged to either the Rolesville or the Puddledock quarry, and not to the quarry where the machine was in operation. Carloads of steel or other materials to be used in various mining operations were purchased by the limited partnership and billed to the individual quarry at which the materials were delivered. Such materials would thereafter be dispensed from that quarry to others, whenever a need arose.

Sales orders were prepared by the partnership's salesmen, with a specific quarry designated as the one from which the sand, rock, or gravel would be delivered. In most instances delivery would be made from the specified quarry. However, the salesmen's designations were not controlling; and orders were occasionally filled from several quarries if this was economically more profitable.

General and administrative expense records were maintained on a combined basis, with no allocation among the 12 quarries. The sales, direct costs of mining, and the large machinery depreciation records, were all kept on an individual quarry basis in Raleigh; however, the depreciation records did not take into account the possibility that a particular machine might have been moved to another quarry.

Both the partnership and its predecessors chose to operate the 12 quarries as if they were a single unit, because such manner of operation enabled them to meet competition more effectively. It was not impossible however, to operate each quarry separately; nor would it have been unprofitable for the quarries to have been operated in such manner.

The limited partnership, in keeping with its general mode of operation, computed its allowable percentage depletion deduction for its fiscal year ending January 31, 1954, to be $190,624.38—which was 5 per cent of the gross income derived from the *combined sales* of sand, rock, and gravel at *all* of the 12 quarries. It was this single unit treatment by the limited partnership of its 12 geographically separate quarries that gave rise to the issue before this Court.

Respondent, in his notice of deficiency, determined that the limited partnership was entitled to a percentage depletion allowance of $163,020.32, which he determined by treating each quarry as a separate property.[1] Respondent also allocated the general and administrative expenses on the basis of the proportion which the sales of each quarry bore to the total sales of all the quarries. By reason of such adjustments, he increased the amounts of the distributive shares of the partners.

---

[1] The 50 per cent net income limitation prescribed by section 114(b)(4)(A) (set out, *infra*) accounts for the reduction of the depletion deduction claimed by the partnership.

OPINION.

The petitioners contend that the limited partnership and its predecessors had consistently operated the 12 quarries as a unit for several years; and that, because of this, the Commissioner should not have cast aside such unitary method and substituted a theoretical apportionment of the operations.

It is true that the limited partnership and its predecessors had operated the 12 quarries as a single unit, insofar as it was possible to do so considering that the quarries were geographically separated by distances up to 225 miles. But it does not necessarily follow from this fact, that the Commissioner erred in his determination. Section 114(b)(4)(A), I.R.C. 1939, provides so far as here material, as follows:

SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

    \*        \*        \*        \*        \*        \*        \*

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

(A) In General.—The allowance for depletion under section 23(m) [which section contains general provisions relating to deductions for depletion of natural deposits] in the case of the following mines and other natural deposits shall be—

(i) in the case of sand, gravel, slate, stone \* \* \*, 5 per centum,

    \*        \*        \*        \*        \*        \*        \*

of the gross income from *the property* during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of *the property*. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from *the property*, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph. [Emphasis supplied.]

Thus, the applicable depletion allowance herein is 5 per cent of the "gross income from the property." The limited partnership contends however that the words "the property" should be so construed as to embrace all 12 quarries. But the Commissioner, on the other hand, contends that such words should be so construed as to have reference to each separate quarry, because they actually were widely separated, geographically.

Under the 1939 Code there is no statutory definition of the words "the property"; and therefore, we must look to the applicable judicial authorities, and to the regulations and administrative rulings of the Treasury Department, in ascertaining the meaning of these words.

Regulations 118, section 39.23(m)–1(i), provides in material part as follows:

Sec. 39.23 (m)–1. *Depletion of mines* \* \* \* *and* \* \* \* *other natural deposits* \* \* \*

(i) "The property," as used in section 114(b) * * * (4) * * *, means the interest owned by the taxpayer in any mineral property. *The taxpayer's interest in each separate mineral property is a separate "property";* but, where two or more mineral properties are included in a *single* tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property," provided such treatment is consistently followed. [Emphasis supplied.]

To the same effect, see G.C.M. 22106, 1941-1 C.B. 245.

The position taken by the Commissioner in the above regulations and in the above-cited ruling has been judicially approved in several cases. For example, in *Buffalo Chilton Coal Co.,* 20 T.C. 398, this Court stated (p. 404):

Regulations 111, section 29.23(m)-1(*i*), *supra,* has appeared in substantially the same form in corresponding articles of Regulations 77, 86, 94, 101, and 103. Although the sections of the revenue acts relating to depletion have been repeatedly amended, Congress has never adopted a statutory definition of the term "property" for such purposes. The courts have applied the definition as contained in the aforementioned regulations as a valid interpretation of the revenue acts. *Helvering* v. *Jewel Mining Co.,* 126 F. 2d 1011; *Black Mountain Corporation,* 5 T. C. 1117; and *Amherst Coal Co.,* 11 T. C. 209. The petitioner's challenge to the validity of the regulations is without merit.

The above-mentioned Regulations 111, section 29.23(m)-1(i), and the above-quoted Regulations 118, section 39.23(m)-1(i) here involved, are identical.

In the instant case, the 12 rock, sand, and gravel quarries not only were widely separated geographically, but as above stated, they were acquired independently and at separate times. We think that these facts, considered in the light of the longstanding provisions of the regulations, the administrative rulings, and the court decisions approving said regulations, all impel a conclusion that said properties must be regarded separately, in computing the partnership's allowable depletion deduction.

It is true that the last clause in section 39.23(m)-1(i) of Regulations 118, contains one exception to the general rule requiring separate treatment of properties. But it is clear that this exception has no application in the instant case, for the reason that no two of the 12 quarries here involved were located within "a single tract or parcel of land." See *Island Creek Coal Co.,* 30 T.C. 370, 378; and *Helvering* v. *Jewel Mining Co.,* (C.A. 8) 126 F. 2d 1011, reversing 43 B.T.A. 1123.

We approve the Commissioner's determination as to the issue here considered.

*Decisions will be entered under Rule 50.*